UNITED STATES of America,
Plaintiff–Appellee,

v.

Jesus FELIX–GUTIERREZ,
Defendant–Appellant.

No. 89–50028.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 4, 1991.

Decided July 22, 1991.

Donald C. Randolph, Gary S. Wigodsky, Overland, Berke, Wesley, Gits, Randolph & Levanas, Santa Monica, Cal., for defendant-appellant.

Robert L. Brosio, Asst. U.S. Atty., Chief, Crim. Div., Steven E. Zipperstein, Asst. U.S. Atty., Chief, Crim. Appeals, Dorothy Shubin, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before BROWNING, D. W. NELSON and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Jesus Felix–Gutierrez appeals his conviction for being an accessory after the fact.

Felix was charged with assisting Rafaelo Caro–Quintero, who allegedly participated in the kidnapping and murder of DEA Special Agent Enrique Camarena–Salazar and Alfredo Zavala, in his effort to avoid capture by law enforcement authorities.[1] Following a jury trial, Felix was convicted and sentenced to 10 years in prison. He raises several issues on appeal. We reject his claims and affirm the judgment of the district court.[2]

## I. Facts

This case arises out of the 1985 kidnapping, torture, and murder of DEA Special Agent Enrique Camarena and Alfredo Zavala, a pilot who was a confidential DEA informant. Camarena and Zavala disappeared on February 7, 1985, in Guadalajara, Mexico. Approximately one month later, their bodies were found lying together in an open field near Zamora, Michoacan, Mexico. They had been brutally tortured and murdered.

During trial, the prosecution introduced evidence that Caro–Quintero, an alleged drug kingpin in Mexico, played a central role in the torture and murders of Camarena and Zavala. Felix and his co-defendant, Rene Martin Verdugo–Urquidez, were associated with the Caro–Quintero narcotics enterprise. Felix was responsible for the importation of hundreds of tons of marijuana into the United States from Mexico and assisted in the importation of cocaine into Mexico and the United States from Columbia and Costa Rica. He directed the distribution by one individual of between one and five kilos of cocaine on at least thirty occasions.

On February 9, 1985, two days after Agent Camarena's disappearance, Caro–Quintero, following a shoot-out at the airport with Mexican law enforcement officials and DEA agents, travelled from Mexico to Costa Rica in a Falcon jet. Felix travelled to Costa Rica from Panama that same day. He thereafter began to travel under aliases between Panama, Costa Rica, and the United States. While in Costa Rica, he assisted Caro–Quintero in purchasing a red Toyota. He was also seen at Caro–Quintero's La Quinta residence and remarked to an associate that Caro–Quintero could not meet with the associate at the time because they were people with few friends. Felix told Arturo de la Torre, who often transported narcotics for him, that he and Inez Calderon had arranged for a pilot to take Caro–Quintero from Mexico to Costa Rica. Felix also stated that the "heat was on" Caro–Quintero because of the kidnapping of Agent Camarena.

Fearing that Caro–Quintero's flashy style would attract law enforcement authorities, Felix left Costa Rica. After Caro–Quintero's arrest, Felix returned to Los Angeles. Notwithstanding the fact that he owned a home and two businesses in Los Angeles, he stayed at the Best Western hotel in Monterey Park. On April 9, 1985, de la Torre visited Felix at the hotel. They watched a television newscast which reported Felix's suspected involvement in the flight of Caro–Quintero from Mexico to Costa Rica. The newscast mentioned Felix's alias and his nickname ("Cachas"). Felix told de la Torre that he never thought that Caro–Quintero would "finger him."

De la Torre drove Felix to Reno, where he had a tattoo removed from his right shoulder. The tattoo consisted of the word "Cachas." Felix returned to Los Angeles and had the stitches removed from his shoulder, and had plastic surgery to add a dimple and to remove the sagging beneath his eyes. He was arrested in Whittier, California on December 24, 1986. At the time of his arrest, he had in his possession false identification, and denied that he was "Cachas."

## II. Extraterritorial Jurisdiction

Appellant contends that the district court lacked subject matter jurisdiction to

---

1. The indictment charged a violation of 18 U.S.C. § 3, which provides in pertinent part: Whoever, knowing that an offense against the United States had been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent apprehension, trial or punishment, is an accessory after the fact.

2. Felix and Verdugo were tried jointly in the district court, along with another defendant. Both Felix and Verdugo timely appealed their convictions. On July 31, 1990, we issued an order consolidating their appeals. We dispose of Verdugo's appeal in a separate published opinion issued concurrently herewith.

try him for criminal acts that occurred entirely outside the United States or its territories. This court reviews *de novo* the question whether the district court lacked subject matter jurisdiction. *United States v. Layton*, 855 F.2d 1388, 1394 (9th Cir. 1988), *cert. denied*, 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989).

### A. Overview

■ Generally, there is no constitutional bar to the extraterritorial application of United States penal laws. *Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir.1984), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985); *United States v. King*, 552 F.2d 833, 850 (9th Cir.1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). Courts look to congressional intent, express or implied, to determine whether a given statute should have extraterritorial application. *United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922); *Chua Han Mow*, 730 F.2d at 1311. Moreover, courts generally look to international law principles to ensure that an extraterritorial application of United States laws is "reasonable." *Id.*

### B. Congressional Intent

■ Felix was charged as an accessory after the fact for assisting Caro–Quintero in eluding law enforcement agents following Caro–Quintero's participation in the kidnapping and murder of a DEA agent. The statute under which Felix was charged does not expressly provide for extraterritorial application. However, we will infer congressional intent to provide for extraterritorial jurisdiction for crimes that are not dependent on the locality in which they were committed "but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated ..." *Bowman*, 260 U.S. at 98, 43 S.Ct. at 41. For such crimes, limiting jurisdiction to the territorial bounds of the United States would greatly curtail the scope and usefulness of the penal statutes. *Id.* Thus, " '[t]he exercise of [extraterritorial power] may be inferred from the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved.' " *United States v. Thomas* 893 F.2d 1066, 1068 (9th Cir.1990) (quoting *United States v. Baker*, 609 F.2d 134, 136 (5th Cir.1980)).

18 U.S.C. § 3 provides that a person is an accessory after the fact if he receives, relieves, comforts or assists someone he knows has committed an offense *against the United States.* Conduct outside the territorial bounds of the United States can be an offense against the United States only if a United States law reaches that conduct. Here, we must examine two questions: (1) whether the underlying crime, Caro–Quintero's participation in the kidnapping and murder of a DEA agent, is subject to extraterritorial application; and (2) whether assisting someone who has committed the underlying crime in avoiding apprehension, trial, or punishment is subject to such treatment.

■ We noted in *Brulay v. United States*, 383 F.2d 345, 350 (9th Cir.), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967), that drug "smuggling by its very nature involves foreign countries, and ... the accomplishment of the crime always requires some action in a foreign country...." It follows that United States agents involved in the investigations of international organizations seeking to smuggle drugs into the United States will, when foreign governments are willing to cooperate, conduct a portion of their activities outside the territorial bounds of the United States. We have no doubt that whether the kidnapping and murder of such federal agents constitutes an offense against the United States is *not* dependent upon the locus of the act. We think it clear that Congress intended to apply statutes proscribing the kidnapping and murder of DEA agents extraterritorially. *See Layton*, 855 F.2d at 1395 (citation omitted) ("the killing of a member of Congress—is 'directly injurious to the government, and [is] capable of perpetration without regard to particular locality' "); *United States v. Benitez*, 741 F.2d 1312, 1317 (11th Cir.1984) (concluding that "assault and attempted murder of DEA agents is exactly the type of crime that Congress must have intended to apply extraterritorially"). Therefore,

the remaining question is whether the offense committed by Felix, in assisting Caro–Quintero to avoid apprehension, trial, or punishment, is subject to extraterritorial application.

■ We conclude that the crime of "accessory after the fact" gives rise to extraterritorial jurisdiction to the same extent as the underlying offense. That is, if the underlying substantive statute applies extraterritorially, the statute making it unlawful to assist another in avoiding apprehension, trial or punishment also applies extraterritorially when invoked in connection with an extraterritorial violation of the underlying statute. Under such circumstances, neither the locality of the underlying offense nor of the related accessory after the fact offense is determinative of whether an offense has been committed against the United States; both extraterritorial offenses injure the government. Limiting jurisdiction to the territorial bounds of the United States would greatly curtail the scope and usefulness of the accessory after the fact statute in cases in which extraterritorial crimes occur. We have inferred extraterritorial application of conspiracy statutes on the basis of a finding that the underlying substantive statutes reach extraterritorial offenses. *See, e.g., Chua Han Mow,* 730 F.2d at 1311; *United States v. Cotten,* 471 F.2d 744, 750 (9th Cir.), *cert. denied,* 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973); *Brulay,* 383 F.2d at 350. We see no reason why a different rule should apply in accessory after the fact cases.[3]

*C. International Law Jurisdictional Limitations*

■ Prior to giving extraterritorial effect to any penal statute, we must consider whether extraterritorial application would violate international law. *Thomas,* 893 F.2d at 1069; *Chua Han Mow,* 730 F.2d at 1311. The law of nations permits the exercise of criminal jurisdiction by a nation under five general principles: territorial, national, protective, universality, and passive personality. *Chua Han Mow,* 730 F.2d at 1312.[4] As one commentator stated, "[R]ules of extraterritorial jurisdiction historically have been governed by the twin principles of sovereignty over national territory and sovereignty over national citizens, with a view to what alternatively has been called 'comity,' 'fairness,' 'justice,' 'reasonableness,' or, more directly, 'the balancing of national interests.'" Note, *Constructing the State Extraterritorially: Jurisdictional Discourse, the National Interest, and Transnational Norms,* 103 Harv.L.Rev. 1273, 1280 (1990) (footnote omitted).

Here, three of the international law principles permitting extraterritorial jurisdiction have application: (i) territorial, (ii) protective, and (iii) passive personality. Under the first two of these, jurisdiction is based on the nature of the conduct or offense. Courts have defined the "territorial" principle to include not only acts occurring within the United States, but acts occurring outside the United States' borders that

3. Our decision is entirely consistent with *EEOC v. Arabian American Oil Co.,* —— U.S. ——, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). In that case, the Supreme Court reiterated the "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Id.* 111 S.Ct. at 1230 (quoting *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949)). This longstanding principle was also recognized in *Bowman,* where the Court stated that if a statute's prohibitions are "to be extended to [apply to acts] committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard." 260 U.S. 94, 98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922). However, *Bowman* went on

to state an exception to the presumption against extraterritoriality. As we have noted, the Court held that "the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated...." *Id. Arabian American* did not purport to overrule this exception, nor did it even mention *Bowman.* Accordingly, we must assume that the *Bowman* exception— which we have applied here—remains the law.

4. For a discussion on the historical development of extraterritorial jurisdiction, see *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

have effects within the national territory. *See, e.g., United States v. Aluminum Co. of America*, 148 F.2d 416, 443 (2d Cir.1945) (stating that "[i]t is settled law ... that any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends"). Under the "protective" principle, jurisdiction is based on whether the national interest or national security is threatened or injured by the conduct in question. Under the "passive personality" principle, courts may assert extraterritorial jurisdiction on the basis of the nationality of the victim.

■ Felix's actions created a significant detrimental effect in the United States and adversely affected the national interest. In helping to prevent the United States from apprehending Caro–Quintero, Felix directly hindered United States efforts to prosecute an alleged murderer of a government agent. Furthermore, that agent was a United States citizen. We need not decide whether any one of these facts or principles, standing alone, would be sufficient. Rather, we hold that cumulatively applied they require the conclusion that giving extraterritorial effect to the accessory after the fact statute in Felix's case does not violate international law principles.

### D. Conclusion

■ In conclusion, we hold that one who helps another who has kidnapped and murdered a DEA agent in a foreign nation to avoid apprehension, trial, or prosecution for such crimes may be prosecuted for that offense in a court of the United States, even though all of his criminal conduct occurred beyond the territorial limits of this country.

### III. Sufficiency of the Evidence

Appellant argues that the evidence introduced at trial was insufficient to sustain his accessory after the fact conviction. Viewing the evidence in the light most favorable to the prosecution, we must decide whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), *reh'g denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979) (emphasis in original).

■ 18 U.S.C. § 3 provides in pertinent part that "[w]hoever, knowing that an offense against the United States had been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact." Both the government and Felix agree that in order to sustain a conviction on this count, the government must prove beyond a reasonable doubt that: (i) Caro–Quintero participated in the kidnappings and murders of Camarena and Zavala; (ii) Felix had knowledge of Caro–Quintero's participation; and (iii) Felix assisted Caro–Quintero in avoiding apprehension, trial or punishment.[5] *See United States v. Rux*, 412 F.2d 331, 333 (9th Cir.1969). Knowledge may be shown entirely through circumstantial evidence. *United States v. Burnette*, 698 F.2d 1038, 1051 (9th Cir.), *cert. denied*, 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 312 (1983). The direct and circumstantial evidence proffered by the prosecution was sufficient to sustain Felix's conviction.

■ In addition to the extensive forensic evidence placing Camarena and Zavala at Caro–Quintero's residence, the prosecution introduced evidence that Caro–Quintero assisted in the interrogation of the two agents. There was also direct and circumstantial evidence that Felix not only knew of Caro–Quintero's participation in the murders and kidnappings, but assisted him despite this knowledge. According to Arturo de la Torre's testimony, Felix informed him that he, along with Inez Calderon, had hired a pilot to take Caro–Quintero from Mexico to Costa Rica because the "heat was on" Caro–Quintero as a result of the Camarena kidnapping. Felix also told Jay de la Torre, a relative of

---

5. Felix contends that the government must also prove an additional circumstance. We discuss this alleged requirement *infra*, at 1206–07.

Arturo's, that [they] "had to get rid of [Camarena]." He travelled to Costa Rica on the same day Caro–Quintero fled Guadalajara to Costa Rica. The prosecution's evidence showed that Felix had a high position within Caro–Quintero's narcotics enterprise. After the news broadcast in which Felix was identified as a suspect in arranging Caro–Quintero's flight, Felix stated that he never thought Caro–Quintero would report him to the authorities. This evidence cumulatively is clearly sufficient to support Felix's conviction as an accessory after the fact to Caro–Quintero.

■ Appellant also argues that his conviction cannot stand because the government introduced no evidence that he intended to help Caro–Quintero avoid apprehension, trial or punishment for *crimes against the United States*. This argument lacks merit. As we noted in *United States v. Hobson*, 519 F.2d 765, 769 (9th Cir.), *cert. denied sub nom. Hobson v. United States* and *Newman v. United States*, 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed. 261 (1975), it is irrelevant whether someone assisting another in avoiding apprehension, trial or punishment knows the "jurisdictional nature of his pursuers." *Id.* More important, here the jury could have reasonably inferred that Felix knew that the United States sought to apprehend Caro–Quintero, as Camarena was a United States citizen working for the DEA, and Zavala was a confidential informant for the DEA.

Viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence was sufficient to sustain Felix's conviction as an accessory after the fact to Caro–Quintero.

## IV. Evidentiary Rulings

■ Felix claims that the district court committed reversible error in admitting "prejudicial" and "irrelevant" evidence. We reject each of his claims. He first contends that the district court, in violation of Rules 404(b) and 403 of the Federal Rules of Evidence, erroneously allowed the government to introduce evidence regarding his drug trafficking activities in 1981 and 1982. Rule 404(b) prohibits the prosecution from introducing evidence of a defendant's prior crimes to show that the defendant has in general a bad character and that therefore he is more likely to have committed the crime with which he is charged. *United States v. McKoy*, 771 F.2d 1207, 1213 (9th Cir.1985).[6] Under Rule 404(b), evidence of other crimes or acts may be admitted where relevant to establish motive. The prosecution's evidence of Felix's narcotics trafficking activity was offered to prove the existence and structure of the narcotics enterprise and to show Felix's membership and position in that enterprise; these facts tended to establish Felix's motive for acting as an accessory after the fact. The prejudicial effect of this evidence does not outweigh its probative value, and therefore it was admissible under Rule 403. Thus, the district court did not abuse its discretion in admitting the evidence of Felix's 1981 and 1982 drug trafficking activities.

■ Appellant also asserts that the admission of evidence regarding his flight was prejudicial error. "Evidence of flight is generally admissible as evidence of consciousness of guilt and of guilt itself." *United States v. Harris*, 792 F.2d 866, 869 (9th Cir.1986) (citations omitted). Since "flight" is essentially an admission by conduct, its probative value as circumstantial evidence depends upon the degree of confidence with which four inferences can be drawn:

(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977); *see also United States*

---

6. Fed.R.Evid. 404(b) provides:
   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*v. Silverman,* 861 F.2d 571, 581 (9th Cir. 1988). Felix's behavior in fleeing from Costa Rica, hiding in Los Angeles, having his distinctive tattoo removed in Reno, submitting to cosmetic facial surgery, and using assumed names strongly supports the inference that his conduct constituted flight. Moreover, the timing of Felix's actions reasonably leads to the second, third, and fourth inferences. The evidence of flight was not more prejudicial than probative. Accordingly, we conclude that the district court did not abuse its discretion in allowing the introduction of that evidence.

■ Finally, Felix argues that the admission of evidence regarding his connections to Costa Rica was prejudicial error. As such evidence tends to prove Felix's ability to establish a safe haven for Caro-Quintero in Costa Rica, and the probative value of such evidence is not outweighed by its prejudicial effect, the district court did not err in allowing the introduction of the evidence of Felix's connections to Costa Rica.

## V. Severance Motion

■ Felix contends that the trial court abused its discretion in denying his motions for severance. The government contends that Felix has waived his right to assert that the district court erred in denying his motion, because he failed to renew it at the close of all evidence. As a general rule, a defendant waives his severance motion by not renewing it at the close of evidence. *United States v. Smith,* 893 F.2d 1573, 1581 (9th Cir.1990). However, we have noted that "[t]his requirement is not an inflexible one; waiver may be absent when the motion accompanies the introduction of evidence deemed prejudicial and a renewal at the close of all evidence would constitute an unnecessary formality." *United States v. Kaplan,* 554 F.2d 958, 965 (9th Cir.) (per curiam), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977). The guiding principle is whether the defendant diligently pursued the motion. *Id.* at 966. Felix asserts that he made several requests for severance based on Rules 8(b) and 14. Felix filed a motion for severance from his co-defendants on April 15, 1988. He later filed an opposition, reply, and supplemental opposition. After the district court denied the motion, Felix filed a motion for reconsideration. Moreover, his severance motion was orally renewed, and denied, several times during trial. Appellant's conduct was sufficient to establish that he "diligently pursued" the motion. Accordingly, we conclude that Felix did not waive his right to challenge the district court's denial of his severance motion.

### A. Rule 8(b): Misjoinder

■ Felix first argues that he was improperly joined with co-defendant Rene Martin Verdugo–Urquidez and with another co-defendant Raul Lopez–Alvarez, who has filed a separate appeal, because the three of them did not participate in the same series of acts or transactions. Rule 8(b) of the Federal Rules of Criminal Procedure governs the joinder of charges against multiple defendants. Rule 8(b) provides:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same acts or transactions or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

In *United States v. Ford,* 632 F.2d 1354, 1371–72 (9th Cir.1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981), we stated that the term "transactions," has a flexible meaning and that the existence of a "series" depends on whether there is a "logical relationship" between the transactions greater than mere factual similarity of events. *Id.* at 1371–72 (citing *United States v. Satterfield,* 548 F.2d 1341 (9th Cir.1977), *cert. denied,* 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978)). The logical relationship between a series of transactions may be shown by the existence of a common plan, scheme, or conspiracy.

All of the charges in this case were overlapping and logically interrelated. The in-

dictment alleged that Verdugo, Lopez, and Felix were members of an international narcotics enterprise and that as part of that enterprise, Verdugo and Lopez allegedly participated in the kidnapping and murder of Camarena, along with Caro–Quintero. Further, the indictment alleged that Felix, as part of the enterprise, helped Caro–Quintero flee to Costa Rica, knowing that Caro–Quintero and other members of the enterprise had participated in the kidnapping and murder of Camarena and Zavala. Evidence of Felix's participation in the narcotics enterprise was necessary to prove the elements of accessory after the fact. The charges against Verdugo, Lopez, and Felix occurred during a brief time span, involved many of the same participants, and were connected in many areas by overlapping proof. Therefore, the district court properly denied Felix's Rule 8(b) motion. *See United States v. Hoelker,* 765 F.2d 1422, 1425–26 (9th Cir.1985).

### B. Rule 14: Prejudicial Joinder

Felix asserts that he was entitled to a separate trial from Verdugo and Lopez because the joint trial was unduly prejudicial to him. We review the denial of a motion for a severance under Rule 14 due to prejudicial joinder for abuse of discretion. *Smith,* 893 F.2d at 1581. The district court has wide discretion in ruling on a severance motion. The party seeking reversal of a decision denying severance has the burden of proving "clear," "manifest," or "undue" prejudice from the joint trial, that violates one of his substantive rights, so that the prejudice is of "such magnitude that the defendant was denied a fair trial." *United States v. Connors,* 825 F.2d 1384, 1391 (9th Cir.1987).

Relying primarily on *United States v. Sampol,* 636 F.2d 621 (D.C.Cir. 1980), Felix argues that the district court abused its discretion in denying his request for severance, because of: (1) confusion of the charges and evidence; (2) grossly disparate charges; and (3) denial of cross-examination and presentation of exculpatory evidence. *Sampol* acknowledged the cumulative weight of the three grounds in reaching its decision. We need not decide whether we would follow *Sampol* in this circuit, or even whether in a particular case an especially strong showing on one of the three elements would be sufficient, because in the case before us Felix cannot prevail under any reasonable construction of the *Sampol* standard.

### 1. Confusion of Charges and Evidence

A defendant in a joint trial has a recognized right to a "severance of defendants or ... whatever other relief justice requires" if it appears that he is "prejudiced by a joinder of offenses or of defendants in an indictment ... or such joinder for trial together...." Fed.R.Crim.P. 14. As in the case of the defendant in *Sampol,* who was charged with misprision of a felony, Felix was accused of a lesser (and less brutal) crime than his co-defendants. However, the circumstances in the *Sampol* trial differ markedly from those here with respect to the possible confusion of the charges against the various defendants. In *Sampol,* there was actual testimony at trial that created the erroneous impression that Ignacio Sampol, who was charged with misprision and false statements, was involved in the underlying offenses; that testimony failed to separate Sampol's conduct from that of the defendants who were charged with the conspiracy and murders. Moreover, Sampol was tried along with his brother, Guillermo Sampol, who the indictment alleged had participated in the underlying conspiracy and murders in addition to two false statement counts. *Sampol* observed that "on one occasion the confusion was so great that one of the witnesses at the trial, describing a meeting in Venezuela, named Guillermo, but pointed to Ignacio." *Id.* at 647. Here, the record does not show such confusion and does not give rise to the clear inference that Felix participated in the kidnapping and murders. None of the defendants here was related and no one testified erroneously that Felix actually participated in the underlying crimes. We therefore conclude that there was no comparable confusion of the charges or evidence in this case.

### 2. Joint Trial On Grossly Disparate Charges

In addition to the question whether the jury was confused by the charges and evidence against the defendants, *Sampol* examined whether the defendant charged with the "lesser" offenses was prejudiced by his joint trial with defendants accused of grossly disparate crimes. In doing so, *Sampol* said, "[I]t is fair to inquire 'whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in the light of its volume and the limited admissibility.'" *Id.* at 647 (quoting *United States v. Gaines,* 563 F.2d 1352, 1355 (9th Cir.1977)). The record shows that the disparity in the charges did not result in clear, manifest, or undue prejudice to Felix. The disparity in the charges between Felix and his co-defendants has less significance than that in *Sampol,* because in Felix's case there was far less danger that the jury could have thought that the evidence that related solely to the other defendants was applicable to him. The record also demonstrates that in its deliberations the jury could more readily have "compartmentalized" the evidence as it related to the separate defendants. Moreover, nothing in the record suggests that the disparity in the charges actually hampered the jury's ability to do so. Although there is always some risk of prejudice in cases of this nature, here we cannot say that any prejudice that may have occurred was of the "magnitude" required by *Connors. See Connors,* 825 F.2d at 1391.

### 3. Denial of Cross–Examination and Presentation of Exculpatory Evidence.

Felix claims that the admission of Verdugo's and Lopez's statements, which were inadmissible as to Felix, caused him undue prejudice. We disagree. In *Sampol,* the D.C. Circuit found that the defendant suffered prejudice from the denial of cross-examination and the right to present exculpatory evidence. *Id.* at 648–51. Again, the court relied on the confusion in the testimony and the fact that witnesses implicated Sampol in the substantive offense. Here, no comparable testimony was adduced. Nor was Felix denied the right to cross-examine or present exculpatory evidence. None of the admissions to which Felix refers expressly implicates him. Therefore, he could not have suffered any prejudice by those admissions. Felix also asserts that, since the declarants did not testify at trial, he was denied his Sixth Amendment right to confront and cross-examine witnesses. Again, we do not find Felix's argument persuasive, since the declarants in no way implicated him.

### 4. Summary

Because we find that there was not any confusion in the charges or the testimony, that under the circumstances of this case the disparity in the charges was not unduly prejudicial, and that Felix was not denied the right of cross-examination or the right to present evidence, we conclude that the district court did not abuse its discretion in denying his severance motion under Rule 14.

## VI. Jury Instructions

Felix claims that the district court erred in failing to instruct the jury as to the essential elements and the meaning of "accessory after the fact," and as to the theory of the defense.

Felix's argument that the district court failed to instruct the jury as to the relevant law of accessory after the fact lacks merit. As discussed above, Felix's contention that the prosecution had to prove that he intended to assist Caro–Quintero in avoiding United States law enforcement, as opposed to Mexican law enforcement, is incorrect. *See United States v. Hobson,* 519 F.2d at 769–70. We also reject Felix's argument that the district court erred in failing to instruct the jury not to consider his prior relationship with Caro–Quintero, as such evidence was clearly admissible and the record shows that the district court properly instructed the jury on its relevance.

With respect to appellant's assertion that the district court failed to instruct the jury as to the defense's theory, "[a] trial court must instruct the jury on the defendant's theory of the case only if the

evidence sufficiently supports the theory and the theory is supported by the law." *United States v. Sommerstedt,* 752 F.2d 1494, 1496 (9th Cir.), *amended,* 760 F.2d 999 (9th Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 149, 88 L.Ed.2d 123 (1985). Unlike proper theory of the defense instructions, which set forth the defendant's theory of the case on a fairly abstract level, Felix's requested "theory of the defense" instructions were essentially arguments regarding the credibility of two witnesses, Arturo and Jay de la Torre. Such credibility determinations should not be made for the factfinder by jury instructions. As we noted in *United States v. Hall,* 552 F.2d 273 (9th Cir.1977), "[T]he court is not required to accept a proposed instruction which is manifestly intended to influence the jury towards accepting the evidence of the defendant as against that of the prosecution." *Id.* at 275 (citation omitted). Moreover, the district court gave extensive and accurate instructions regarding the credibility of witnesses. Thus, the district properly rejected Felix's proposed "theory of the defense" jury instructions.

The judgment of the district court is AFFIRMED.