29 F.3d 637
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rene Martin VERDUGO-URQUIDEZ, Defendant-Appellant.
 No. 88-5462.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 11, 1993.
Decided June 22, 1994.
As Amended on Denial of Rehearing and Rejection of
Suggestion for Rehearing En Banc Aug. 5, 1994.
 
 Before: BROWNING, D.W. NELSON, and REINHARDT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 In United States v. Alvarez-Machain, the Supreme Court reversed the decision of another Ninth Circuit panel which relied exclusively on our prior decision in the present case. 112 S.Ct. 2188, 2190-91 (1992), rev'g 946 F.2d 1466 (9th Cir.1991). The Court thus disapproved our earlier decision and, accordingly, vacated that decision and remanded "for further consideration in light of United States v. Alvarez-Machain." United States v. Verdugo-Urquidez, 112 S.Ct. 2986 (1992), vacating 939 F.2d 1341 (9th Cir.1991).
 
 
 3
 Verdugo's appeal originally presented numerous issues; we found it necessary to address only his jurisdictional challenge based on a purported violation of the extradition treaty between Mexico and the United States by the abduction and removal of Verdugo from Mexico to bring him to trial in this case. 939 F.2d at 1344. Because the Supreme Court rejected our initial decision, we must now consider the other issues originally presented by Verdugo.[1]
 
 
 4
 The parties are familiar with the facts and issues; we restate them only as necessary. We affirm in part and reverse in part.
 
 I. ABDUCTION ISSUES
 
 5
 Verdugo raises three issues relating to his abduction and removal to the United States in addition to the issue resolved by the Supreme Court in Alvarez-Machain. He asserts a violation of customary international law independent of the purported breach of the extradition treaty, violation of the Due Process Clause and violation of the doctrine of specialty.
 
 
 6
 Outrageous government conduct is a prerequisite to Verdugo's international law and due process claims. See United States v. Alvarez-Machain, 971 F.2d 310, 311 (9th Cir.1992). The government's conduct in obtaining custody of Verdugo was not shocking and outrageous. See United States v. Verdugo-Urquidez, 856 F.2d 1214, 1216 (9th Cir.1988) (reciting facts of Verdugo's abduction by Mexican authorities), rev'd on other grounds, 494 U.S. 259 (1990).[2]
 
 
 7
 Verdugo claims his prosecution violated the doctrine of specialty because he was not extradited on the charges underlying his convictions. We have assumed Verdugo was not delivered to the United States pursuant to the terms of the extradition treaty with Mexico. See 939 F.2d at 1343; see also Alvarez-Machain, 946 F.2d at 1466. If this assumption is correct, Verdugo cannot rely on the doctrine of specialty because that doctrine is relevant only to extradition. Cf. United States v. Najohn, 785 F.2d 1420, 1422 (9th Cir.1986) (specialty is concerned with obligations undertaken by the petitioning country to obtain extradition).
 
 
 8
 In an effort to establish he was in fact extradited and therefore could invoke the specialty doctrine, Verdugo sought an evidentiary hearing to show high-ranking Mexican officials were involved in planning his removal to the United States and asked for copies of the American warrants issued for his arrest. Even assuming Verdugo's allegations are true, more would be necessary to show the United States invoked the extradition treaty with Mexico to obtain custody of Verdugo. Under the treaty, a formal request by the United States is necessary to initiate extradition proceedings. No such request is alleged. See United States v. Valot, 625 F.2d 308, 310 (9th Cir.1980), and cases there cited.[3]
 
 II. SUFFICIENCY OF INDICTMENT
 
 9
 Verdugo challenges the sufficiency of count five of the second superseding indictment, charging felony murder. We rejected the same challenge in the appeal of Verdugo's co-defendant, Lopez-Alvarez. See 970 F.2d at 596-97. That decision controls here.
 
 III. SUFFICIENCY OF EVIDENCE
 
 10
 Verdugo was convicted of the following crimes: conspiracy to kidnap a federal agent, in violation of 18 U.S.C. Sec. 1201(c); kidnapping a federal agent, in violation of 18 U.S.C. Sec. 1201(a)(5); felony-murder of a federal agent, in violation of 18 U.S.C. Secs. 1111, 1114; and two counts of committing violent crimes in aid of racketeering activity, in violation of former 18 U.S.C. Sec. 1952B, now codified at 18 U.S.C. Sec. 1959.
 
 
 11
 In Lopez-Alvarez's appeal, we upheld the jury's finding that the conspiracy to kidnap Camarena existed in fact. 970 F.2d at 593 (sufficient evidence supported conviction of Verdugo's co-defendant of conspiracy to kidnap Camarena). We need only determine if the government presented sufficient evidence to link Verdugo to this conspiracy. See, e.g., United States v. Bautista-Avila, 6 F.3d 1360, 1362 (9th Cir.1993). Only a slight connection is necessary, but it must be proved beyond a reasonable doubt. Id.
 
 
 12
 The prosecution presented evidence that Verdugo was a high-level member of the Caro-Quintero drug enterprise. Verdugo arranged for large quantities of marijuana provided by Caro to be imported to Arizona from Mexico in a helicopter owned by Caro and purchased with money delivered by Verdugo. On February 5, two days before Camarena was kidnapped, police seized two tons of marijuana and the helicopter from a marijuana operation at Casa Grande, Arizona that was under Verdugo's supervision. Leaders of the Caro-Quintero drug enterprise attributed large losses of marijuana to Agent Camarena.
 
 
 13
 Two days later, on February 7, Verdugo registered at the Guadalajara Hyatt Regency. On the same day, Camarena was kidnapped in Guadalajara and taken to Caro-Quintero's Lope de Vega compound in Guadalajara where he was held captive and interrogated. Gomez-Espana testified that Verdugo was at Lope de Vega at the time Camarena was there. The witness also testified that he had given Verdugo a ride from Caro's compound to the Hyatt hotel and observed that Verdugo looked tired. During the ride, Verdugo remarked he had "taken care of a problem" and, addressing his fellow passenger, added, "Didn't we, Commandante?"
 
 
 14
 A forensics team found hair substantially like Verdugo's in the one-room house at Lope de Vega where Camarena was most likely tortured and interrogated. This building was small, dark, and dirty, and resembled a prison, making it unlikely Verdugo would enter it for innocent reasons. When Camarena mentioned Verdugo's name during the agent's torture and interrogation, there was a lengthy pause in the interrogation followed by further questioning about Verdugo by a new interrogator. A month or two after the abduction and murder of Camarena, Verdugo was overheard referring to a "narc" and "someone being beat to shit, and they were begging and crying." Based on this evidence a rational juror applying the reasonable doubt standard could find Verdugo guilty as a principal or an aider and abettor of conspiracy to kidnap, kidnapping, murder, and committing a violent felony against Camarena in aid of racketeering activities.
 
 
 15
 Verdugo is also vicariously liable for the crimes of his co-conspirators committed pursuant to and in furtherance of the conspiracy. E.g., United States v. Inafuku, 938 F.2d 972, 974 (9th Cir.1991). Sufficient evidence was adduced at the joint trial of Verdugo and Lopez-Alvarez to sustain Lopez-Alvarez's convictions for kidnapping, murder, and committing a violent crime against Camarena in aid of racketeering activity. Lopez-Alvarez, 970 F.2d at 593. Because Verdugo was a co-conspirator of Lopez-Alvarez, Lopez-Alvarez's convictions on these charges provide an independent basis for affirming Verdugo's convictions for the same offenses.
 
 
 16
 The remaining conviction is for commission of a violent crime against Zavala in aid of racketeering activity. We reversed Lopez-Alvarez's conviction on this count for lack of direct evidence that Lopez-Alvarez committed a crime against Zavala. 970 F.2d at 593-94. The case against Verdugo is similarly deficient. The transcripts of Camarena's interrogation contain nothing suggesting Verdugo's involvement in violent acts against Zavala. Furthermore, Verdugo's self-incriminating statements refer to only a single violent episode. And while there may have been reason for Verdugo to attack Zavala, the motive is by no means as clear regarding Zavala as it is regarding Camarena. As in Lopez-Alvarez, "the only evidence supporting [Verdugo's] conviction for violent crimes against Zavala is that linking Zavala to the Camarena affair." Id. at 593. Accordingly, we reverse Verdugo's conviction under former section 1952B for committing a violent act against Zavala in aid of racketeering activity.[4]
 
 IV. EVIDENTIARY RULINGS
 
 17
 The district court did not abuse its discretion by excluding testimony that Espino-Verdin told Mexican police that Verdugo was not present at Lope de Vega during the interrogation of Camarena. The statement failed to meet at least one of the requirements for admitting an exculpatory hearsay statement under the exception for statements against penal interest--corroborating circumstances do not clearly indicate the statement was trustworthy. See United States v. Nazemian, 948 F.2d 522, 530 (9th Cir.1991).
 
 
 18
 In assessing the trustworthiness of hearsay, we consider the time at which the declaration was made, the party to whom it was made, the existence of corroborating evidence, the extent to which the declaration is against the declarant's interest, and the availability of the declarant as a witness. Id. at 531. The trustworthiness of the hearsay statement is weakened by the fact that it was not spontaneous and was taken while Espino was in the custody of the Mexican Federal Judicial Police under questioning regarding his role in the kidnapping and torture of Camarena and Zavala. See, e.g., United States v. Ospina, 739 F.2d 448, 452 (9th Cir.1984); United States v. Oropeza, 564 F.2d 316, 325 (9th Cir.1977). There was no evidence directly corroborating Espino's statement, and the statement was contradicted by other testimony placing Verdugo at Lope de Vega. The statement is not strongly against Espino's penal interest--it added little to other evidence against Espino. Although Espino was not available to testify, that circumstance alone is not enough to render exclusion of the hearsay statement an abuse of discretion.
 
 
 19
 We have reviewed the numerous other evidentiary rulings to which Verdugo objected during the lengthy trial. The government's arguments in support of these rulings are persuasive (see Appellee's Consolidated Brief at 44-58) and we find no reversible error.
 
 V. CONTINUANCE
 
 20
 Considering the relevant factors, we conclude the district court did not abuse its discretion in denying Verdugo's request for a continuance to interview Espino. See United States v. Flynt, 756 F.2d 1352, 1359 (9th Cir.)., amended, 764 F.2d 675 (9th Cir.1985). The request was tardy and, as discussed above, the hearsay relating to Espino's statement was not reliable. The likelihood Verdugo could interview Espino was not great (there was nothing to indicate either Mexican prison authorities or Espino would cooperate and some indication Espino would not); Espino was awaiting trial and had little incentive to implicate himself to exculpate Verdugo; the delay would have been substantial, and would have inconvenienced government witnesses and the court. Espino had been identified as Camarena's main interrogator, and in choosing between conflicting testimony regarding Verdugo's presence at Lope de Vega, the jury would probably believe Gomez-Espana, a relatively uninvolved witness who placed Verdugo at Lope de Vega, rather than Espino, who reportedly said Verdugo was not there. Nor did the trial court abuse its discretion in denying motions for continuances to review Jencks Act materials. Verdugo was provided these materials forty-eight hours prior to the witnesses' testimony. He fails to state how he was prejudiced by this limitation, except to refer to delay in the discovery of the Espino hearsay which we consider immaterial.
 
 VI. BRADY VIOLATIONS
 
 21
 Verdugo contends the government withheld or belatedly produced the following evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963): an additional transcript of Camarena's interrogation; tape recordings of Caro-Quintero's interrogation by MFJP officers; DEA reports of interviews concerning Espino's interrogation; government reports that might have shown that Verdugo was not the number two man in Caro's enterprise; and reports showing that Felix-Gallardo rather than Caro-Quintero was responsible for Camarena's abduction.
 
 
 22
 To prove a Brady violation, the defense must show a failure to disclose "material" evidence which would have created a reasonable probability that the result of trial would have been different. E.g., United States v. Brumel-Alvarez, 991 F.2d 1452, 1461 (9th Cir.1992). To avoid a Brady violation, the government need only disclose the evidence when it would still be of value to the defendant at trial. United States v. Gordon, 844 F.2d 1397, 1403 (9th Cir.1988). Much of the evidence to which Verdugo refers was disclosed during trial when Verdugo could still use it. There is no reasonable probability earlier disclosure would have changed the result.
 
 
 23
 Withholding a third copy of the transcript of Camarena's interrogation was harmless. The defense had access to other recordings of the interrogation and Verdugo provides no basis for his assertion that the third copy "would show that it was not the Rafael Caro Quintero narcotics organization which was responsible for the kidnapping, but rather a Guadalajara narcotics cartel." Appellant's Third Supplemental Reply Brief at 7.
 
 
 24
 Verdugo was advised about tapes of Caro-Quintero's interview in early May 1988 but failed to request them until August. The district court allowed Verdugo to recall Agent Castillo for cross-examination. In any event, Verdugo does not indicate how the tapes would exculpate him.
 
 
 25
 The government disclosed the reports of Espino's interrogation approximately two weeks into the two-month long trial. The trial court offered to recall any government witness to neutralize the possibility of prejudice from the delay. Moreover, as previously noted, Espino's hearsay was contradicted by the testimony of Gomez-Espana, and it is improbable the jury would have believed Espino.
 
 
 26
 The government was not required to prove Verdugo's exact position in the Caro-Quintero hierarchy. Although the government relied upon evidence that Verdugo was a leader in the Caro-Quintero drug operation as a circumstance lending support to an inference of knowledge of various facts, his leadership role is not denied and the inference did not depend upon the precise place in the hierarchy Verdugo occupied. Reports indicating Verdugo was not the number two man would not have exculpated him or affected the result of the trial. Similarly, reports that Felix-Gallardo was also involved in the kidnapping would not have exculpated Verdugo. See Lopez-Alvarez, 970 F.2d at 598 (rejecting similar Brady claim by Verdugo's co-defendant).
 
 
 27
 Verdugo's request for access to presentence reports was properly denied. See United States v. Chavez-Vernaza, 844 F.2d 1368, 1375 (9th Cir.1987) ("the defendant is not entitled under Brady to inspect [the presentence reports] himself").
 
 VII. PROSECUTORIAL MISCONDUCT
 
 28
 Verdugo accuses the prosecution of inflammatory comments, disparaging defense counsel, and vouching for the credibility of witnesses. We rejected the same contentions in the appeal by Verdugo's co-defendant. See Lopez-Alvarez, 970 F.2d at 597-98. There is no reason to reach a different result here. Verdugo contends the prosecution argued matters outside the record on a number of occasions. In each instance the government's argument was based on fair inferences from the evidence. Moreover, the trial court instructed the jury the statements of counsel were not evidence. See id. at 598.
 
 VIII. SEVERANCE
 
 29
 The charges against Verdugo were not misjoined with charges against his co-defendants, Felix-Gutierrez and Lopez-Alvarez. Felix-Gutierrez, 940 F.2d at 1208-09; see also United States v. Vasquez-Velasco, 15 F.3d 833, 843-44 (9th Cir.1994). We have already upheld joinder of the charges of Verdugo's less culpable co-defendant, Felix-Gutierrez. See Felix-Gutierrez, 940 F.2d at 1209-10; see also Vasquez-Velasco, 15 F.3d at 845-47.
 
 IX. JURY INSTRUCTIONS
 A. Theory of the Defense
 
 30
 The district court properly rejected Verdugo's request that the jury be instructed:
 
 
 31
 [u]nless you have been convinced beyond a reasonable doubt that Rene Verdugo went to 881 Lope de Vega to participate in the interrogation of Enrique Camarena, you must find him not guilty of all charges in the indictment.
 
 
 32
 Since there was sufficient evidence Verdugo was a member of the conspiracy to kidnap, interrogate, and murder Camarena, the jury could have convicted Verdugo even if he went to Lope de Vega for reasons other than to interrogate Camarena.
 
 B. Aiding and Abetting
 
 33
 Verdugo claims it was plain error for the trial court not to read to the jury the last paragraph of Devitt & Blackmar instruction 12.03 (3d ed. 1977), stating the jury must find the underlying crime was committed to convict on an aiding and abetting theory. The district court read excerpts of the aiding and abetting statute, 18 U.S.C. Sec. 2, and a modified version of Devitt & Blackmar instruction 12.02, which stated:
 
 
 34
 Every person who thus willfully participates in the commission of an offense may be found to be guilty of that offense. Participation is willful if done voluntarily and intentionally, and with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be done; that is to say, with a purpose either to disobey or to disregard the law.
 
 
 35
 This instruction fairly implied the crime must have been committed by someone else and was therefore sufficient to withstand a plain error challenge. See United States v. Armstrong, 909 F.2d 1238, 1243-44 (9th Cir.1990). Furthermore, any deficiency in the instructions with respect to aiding and abetting would not have affected Verdugo's substantial rights--the jury could properly convict Verdugo for participation in the conspiracy without reference to aiding and abetting.
 
 C. Eyewitness Identification
 
 36
 Calderon testified that sometime in 1982 he witnessed a meeting in a National City restaurant between Verdugo, Felix, and others, and that subsequently there was an increase in the marijuana supply at the Fowlie ranch. Verdugo asked that the jury be instructed in accordance with Devitt & Blackmar instruction 15.19 (3d ed. 1977) regarding the reliability of identification testimony.
 
 
 37
 Rejection of the Devitt & Blackmar instruction was not error. The instruction relates to eyewitnesses to a crime and could have confused the jury. Verdugo does not explain why the instructions actually given did not address his concerns. See also Felix-Gutierrez, 940 F.2d at 1211 ("the district court gave extensive and accurate instructions regarding the credibility of witnesses").
 
 
 38
 * * *
 
 
 39
 We have reviewed Verdugo's other contentions and find them without merit. The judgment of the district court is affirmed in all respects except that one of Verdugo's two convictions under former section 1952B, now 18 U.S.C. Sec. 1959, is reversed.
 
 
 40
 AFFIRMED IN PART and REVERSED IN PART.
 
 REINHARDT, Circuit Judge, dissenting:
 
 41
 The trial in this case followed the infamous international kidnappings of two Mexican citizens, Dr. Humberto Alvarez-Machain and the defendant, Rene Martin Verdugo-Urquidez, by United States government agents. They were kidnapped because the Drug Enforcement Agency suspected the two men of participating in the brutal murder of DEA Agent Enrique Camarena-Salazar in Guadalajara. Several years after the kidnappings, United States District Court Judge Edward Rafeedie dismissed all charges against Dr. Alvarez-Machain due to insufficiency of the evidence. In my opinion, the evidence against Verdugo is no more inculpatory. Thus, it would seem, ironically, that in both cases the government ultimately lacked the evidence necessary to prove that the men it kidnapped were guilty.[1]
 
 
 42
 Regrettably, the majority is unwilling to reverse Verdugo's conviction. Before explaining why a review of the record demonstrates that the evidence is wholly insufficient to support the verdicts, I am compelled to comment on the majority's equally unfortunate decision to treat this important case in an unpublished memorandum disposition. In my view, we clearly violate our rules by doing so.[2] Regardless of whether we are violating our rules, however, our failure to write and publish an opinion here is significant for what it reveals about the current state of our judicial system. My colleagues in the majority are able, dedicated, and hard-working. The truth is, however, that due to our overwhelming caseload we, as a judiciary, simply lack the time to write opinions in cases in which they are warranted. As a result, more and more of our dispositions are issued in unpublished form. The quality of these dispositions, and sometimes the quality of the justice dispensed in them, leaves much to be desired.[3] Although none of this is news to any of us, federal judges are unwilling to acknowledge the need to increase our numbers significantly. Too many of us simply like the status quo. See Stephen R. Reinhardt, Too Few Judges, Too Many Cases: A Plea To Save the Federal Courts, A.B.A. J., Jan. 1993, at 52. As a result, we are, more and more frequently, burying important cases like the one before us in unpublished memorandum dispositions.
 
 
 43
 Turning to the case at hand, I dissent from the majority's holding in Part III that there is sufficient evidence to support the convictions of Verdugo for conspiring to kidnap a federal agent, kidnapping a federal agent, felony-murder of a federal agent, and committing violent crimes in aid of racketeering activity.
 
 
 44
 The only concrete evidence that the government has provided for the convictions is that Verdugo may have had a motive to participate in the conspiracy and that on or about the day of the murder he was present at the large compound where Camarena was held captive. These facts are insufficient to permit a reasonable juror to conclude beyond a reasonable doubt that Verdugo participated in the conspiracy to murder Camarena or committed any of the other offenses of which he was convicted.
 
 
 45
 In addition, the government relies on two other categories of evidence to support the conviction. In each case, however, the specific evidence is of little or no probative value. First, the government urges that some extremely vague comments made by Verdugo buttress its case. It argues that Verdugo's statement that he had "taken care of a problem" represents proof that he participated in the murder of Camarena. The comment is of little evidentiary worth because there is no evidence suggesting that the "problem" in question was Camarena. In fact, the comment is not of much more relevance than the observation, also relied upon by the government, that Verdugo "looked tired." There are clearly a large number of possible explanations for Verdugo's fatigue, and the testimony contributes absolutely nothing to the government's effort to prove beyond a reasonable doubt that Verdugo was guilty of the crimes with which he was charged. Similarly, the government's evidence concerning Verdugo's reference, months after the incident, to the beating of a "narc" is of little probative worth. The government offers no proof that Verdugo was relating an incident that he personally witnessed or doing anything more than referring to what was by then undoubtedly a well-known story, at least in the circles in which Verdugo seems to have operated.
 
 
 46
 The second category of evidence is physical evidence. In truth, the government's entire case with respect to all of the counts hangs by a single hair. The prosecution tried to place Verdugo at the actual scene of the crime by introducing evidence that a hair "substantially like Verdugo's" was in the room where Camarena "was most likely tortured and interrogated" (emphasis added). Surely the government's discovery of a hair that resembles Verdugo's in a room where the government thinks the crime took place cannot satisfy the rigorous standards of proof that our system of justice imposes upon the prosecution.
 
 
 47
 In my opinion, no reasonable juror could find that the government's evidence proves beyond a reasonable doubt that Verdugo participated in the crimes with which he is charged. Accordingly, I dissent from Part III of the majority's disposition. I would reverse Verdugo's convictions on the ground of insufficiency of the evidence.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 We consider Verdugo's second and third supplemental briefs filed after remand only to the extent they deal with issues originally presented in his opening brief. (The issues dealt with in Verdugo's first supplemental brief were decided by the Supreme Court in Alvarez-Machain.) We do not consider Verdugo's arguments to the extent they relate to matters not in the record. See Order of March 31, 1993 (striking third supplemental excerpt of record)
 
 
 [2]
 Although Verdugo seeks an expanded evidentiary hearing regarding facts surrounding his abduction and removal from Mexico, the district court has already conducted a limited proceeding and made findings upon which we relied in our 1988 decision. See Verdugo-Urquidez, 856 F.2d at 1216. Among the district court's findings was that "[a]t no time was Verdugo beaten, tortured, physically struck or verbally threatened or tormented" during his transfer to the United States. United States v. Verdugo, No. 86-0107-JLI-Crim., slip op. at 8 (S.D.Cal. Apr. 11, 1986)
 
 
 [3]
 Verdugo disputes extraterritorial application of the statutes underlying his convictions. We rejected the same arguments in the appeals of Verdugo's co-defendants. United States v. Lopez-Alvarez, 970 F.2d 583, 596 (9th Cir.1992); United States v. Felix-Gutierrez, 940 F.2d 1200, 1203-06 (9th Cir.1991)
 
 
 [4]
 Because Lopez-Alvarez was not convicted on this count, we cannot hold Verdugo vicariously liable for the kidnapping and murder of Zavala in aid of racketeering
 
 
 [1]
 Two other individuals involved in these events were arrested within the United States and subsequently tried and convicted. In United States v. Felix-Guitierrez, 940 F.2d 1200 (9th Cir.1991), cert. denied, 113 S.Ct. 504 (1992), we affirmed the conviction of Jesus Felix-Guitierrez for being an accessory after the fact in the conspiracy to kidnap and murder Camarena. In United States v. Lopez-Alvarez, 970 F.2d 583 (9th Cir.), cert. denied, 113 S.Ct. 504 (1992), we affirmed the conviction of Lopez-Alvarez for violent crimes in aid of racketeering for the kidnapping and murder of Camarena, conspiring to kidnap a federal agent, kidnapping a federal agent, and felony-murder of a federal agent
 
 
 [2]
 Ninth Cir.R. 36-2 provides for the publication of dispositions of public importance as well as dispositions after a remand by the Supreme Court. The rule applies to dispositions that "[i]nvolve[ ] a legal or factual issue of unique interest or substantial public importance" or that are issued "following a reversal or remand by the United States Supreme Court." This case clearly meets both these criteria
 
 
 [3]
 Even in the case at hand, the majority gives short shrift to some of Verdugo's claims. The majority concludes its disposition without addressing many of the 21 issues Verdugo raised on appeal simply by noting, "[w]e have reviewed Verdugo's other contentions and find them without merit." Similarly, it dismisses the "numerous other evidentiary rulings to which Verdugo objected" merely by citing the government's brief