**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Patricia King HILL, Defendant–
Appellant.**

No. 00–30023.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 7, 2001.

Filed Jan. 29, 2002.

Ephraim Margolin, Law Offices of Ephraim Margolin, San Francisco, California, for the defendant-appellant.

Christopher L. Cardani, Assistant United States Attorney, Eugene, Oregon, for the plaintiff-appellee.

Before: T.G. NELSON, GRABER, and RAWLINSON, Circuit Judges.

T.G. NELSON, Circuit Judge.

This appeal presents three questions: (1) whether it is constitutional to prosecute a wife for harboring her fugitive husband or for being an accessory after the fact to his crime; (2) whether the federal proscription against harboring a fugitive confers jurisdiction even if the harboring occurs outside the United States; and (3) whether an accessory indictment that fails to specify the principal's crime is legally sufficient. Because we hold that the answer to the first two questions is "yes" and

the answer to the third question is "no," we affirm Patricia King Hill's harboring conviction but reverse her accessory conviction.

## I

## FACTS AND PROCEDURAL HISTORY

This case arises from one man's efforts to avoid paying more than $100,000 in past-due child support. In 1979, Charlie Hill (Charlie) divorced his wife, Victoria, in New Mexico. As part of the divorce decree, Charlie acknowledged that he was the father of two children born of the union and agreed to pay Victoria $450 per month for their support. Despite this agreement, he has made no voluntary support payments since 1979.

In November 1993, Charlie married the defendant/ appellant, Patricia King Hill (Hill), an attorney and business-woman of substantial means. The Hills lived in France and Luxembourg before settling on a ranch in Umpqua, Oregon. In 1995, just two years into their marriage, Charlie's unpaid obligation caught up with the couple when the IRS garnished part of their joint tax refund because of Charlie's child support arrears.

In 1997, Victoria filed suit in New Mexico to collect the child support that Charlie owed her. When Charlie failed to appear and respond to that state's order to show cause, the court found him in contempt. In December 1997, Hill witnessed Charlie's arrest on this contempt warrant. Indeed, Hill posted Charlie's bail and then retained counsel to defend the suit brought by Victoria, which by then had yielded a $177,000 default judgment against Charlie.

In May 1998, two Department of Health & Human Services investigators attempted to interview Charlie at the Oregon ranch concerning his failure to pay child support. While there, the investigators informed both Charlie and Hill that the matter was now being investigated as a potential violation of federal criminal law.

Charlie fled to Mexico soon after the investigators' visit. Before doing so, he told a ranch hand, in Hill's presence, that he was fleeing because of the child support charges. Shortly thereafter, Hill listed her Oregon ranch for sale and began looking for similar property in Mexico. The couple located property in June, and Hill purchased it in August 1998.

Hill subsequently invested $300,000 in improving the Mexican ranch property, where Charlie lives and works. In addition, between May and December 1998, Hill wired money to Charlie in Mexico and transferred money from her personal account to the couple's joint account so that Charlie would have something to withdraw.

On October 15, 1998, a federal judge in Oregon signed a criminal complaint charging Charlie with a misdemeanor violation of 18 U.S.C. § 228 (Child Support Recovery Act). An arrest warrant issued the same day. A week later, on October 23, 1998, a federal agent who did not know that Charlie had fled to Mexico returned to the Hills' Oregon ranch in order to arrest him. The agent did not apprise Hill of the outstanding warrant, and she refused to divulge Charlie's location.

In December 1998, agents again visited Hill at her Oregon ranch, and she again refused to divulge her husband's whereabouts. By this time, however, she had been informed that there was a misdemeanor warrant for Charlie's arrest. Agents served Hill with a subpoena commanding her to appear before a grand jury on December 17, 1998.

The night before her scheduled appearance, Hill met with Steve Kimball, one of her former ranch hands, at a local restau-

rant. During that meeting, Hill asked Kimball if he would drive a truck and trailer to a destination that she would name later if she and her husband paid all of his expenses. Kimball agreed.

When she appeared the next morning before the grand jury, Hill refused to answer questions, invoking both her right against self-incrimination and the privilege not to testify against one's spouse. As soon as she finished, she flew to Chicago and then to Mexico, where she joined Charlie.

Later that same day, the grand jury indicted Charlie for felony violation of the Deadbeat Parents Punishment Act of 1998 and a felony warrant was issued for his arrest. By the time federal agents tried to notify Hill of this, however, she was gone. Accordingly, they notified four other people: Hill's business attorney in Chicago, her criminal defense attorney in Eugene, Steven Kimball, and Vicki Powell, who looked after the house for the Hills. All were requested to inform Hill of Charlie's felony indictment and the warrant for his arrest at their first opportunity. Vicki Powell later testified that she did so during the first or second week of 1999.

Sometime in the first few days of January 1999, Charlie contacted Kimball and told him that Hill wanted him to drive the couple's truck, trailer, pets and belongings to the Mexican border. Hill later called her business partner in Illinois and asked him to send a $2,000 cashier's check to Kimball in Oregon. When Kimball received the check via Federal Express on January 5, 1999, he notified the federal agents with whom he was then cooperating. A few days later, on January 11, 1999, a federal judge in Oregon signed a criminal complaint charging Hill with be-

ing an accessory after the fact, and a warrant issued for her arrest as well.

Sometime after January 5, 1999, but, according to Vicki Powell, *after* she had informed Hill of the felony warrant for Charlie's arrest, Kimball embarked on his trip to Mexico.[1] Along the way, Kimball had second thoughts about cooperating with the Government. Accordingly, while talking by phone with Charlie, who had flown with Hill from Morelia, Mexico, to Hermosillo, Mexico, to meet him at the border, Kimball told Charlie that federal agents were following him. At that point, Hill took over the negotiations with Kimball and tried to persuade him to deliver the truck, trailer, and belongings to one of the Hills' associates and to fly back to Oregon using a ticket they would purchase on his behalf. The associate refused to become involved, however, so Kimball turned the truck around and drove back to Oregon pursuant to law enforcement's advice. While the Hills were waiting for Kimball to deliver their belongings and were negotiating with him, a deputy U.S. marshal spoke with Hill and entreated her to come across the border and retrieve her pets and belongings. Hill declined, saying she could not drive such a large truck.

On January 25, 1999, Hill flew from Mexico to the Cayman Islands to look into setting up a bank account that would be safe from U.S. Government forfeiture. Two days later, police arrested Hill when her return flight made a stopover in Miami. There she spent five days in jail before disclosing the address of her ranch in Mexico and being released.

After Hill waived her right to a jury trial, the district court convicted her of both of the charged counts: harboring a

---

**1.** Although Kimball was working with federal agents, the Government cannot pinpoint the exact dates of Kimball's trip.

fugitive[2] and being an accessory after the fact.[3] She was sentenced to three years of probation, no fine, no time in custody, and was told that the court would look favorably upon a motion to terminate her probation should Charlie return to face the charges against him.

As of July 21, 2000, Charlie remained at large in Mexico.[4] Hill appeals her convictions.

## II

## ANALYSIS

### A. Hill's Constitutional Challenge

■ Hill first argues that the harboring and accessory statutes are unconstitutional as applied to her because they criminalize conduct in which she is entitled to engage under the First and Fifth Amendments to the Constitution. Specifically, Hill alleges that the statutes impermissibly infringe upon her rights of association, marriage, privacy, and due process. We find no merit in Hill's constitutional challenge, which we review de novo.[5]

Hill relies on *Griswold v. Connecticut*.[6] In *Griswold*, the Supreme Court stated that the marriage relationship lies "within the zone of privacy created by several fundamental constitutional guarantees."[7] Accordingly, courts must "examine careful-

ly the importance of the governmental interests advanced and the extent to which they are served"[8] by laws "that operate[ ] directly on an intimate relation of husband and wife,"[9] or laws that "slic[e] deeply into the family"[10] because " 'freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause.' "[11] From this unassailable general proposition, Hill proceeds directly to the conclusion that the harboring and accessory statutes unconstitutionally intrude upon her marriage. This leap of logic is unwarranted.

The mere fact that a statute affects the marriage relationship does not mean that the statute runs afoul of *Griswold*. The problems in *Griswold* were that the anti-contraceptive statute operated "directly on an intimate relation"[12] of the marriage and sought "to achieve its goals by means having a maximum destructive impact upon [the marital] relationship," thus "sweep[ing] unnecessarily broadly."[13] The issue is whether the harboring and accessory statutes do the same in this case.

The harboring and accessory statutes prohibit, among other things, providing shelter, material support, assistance and comfort to a criminal or fugitive. Providing such to a spouse is the norm in the context of marriage—indeed, it is expected

2. *See* 18 U.S.C. § 1071.

3. *See* 18 U.S.C. § 3.

4. Mexico is apparently unwilling to extradite Charlie because failing to pay child support is not a criminal offense there.

5. *United States v. Dubose*, 146 F.3d 1141, 1142 (9th Cir.1998).

6. 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

7. *Id.* at 485, 85 S.Ct. 1678.

8. *Moore v. City of East Cleveland*, 431 U.S. 494, 499, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

9. *Griswold*, 381 U.S. at 482, 85 S.Ct. 1678.

10. *Moore*, 431 U.S. at 498, 97 S.Ct. 1932.

11. *Id.* at 499, 97 S.Ct. 1932 (quoting *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974)).

12. *Griswold*, 381 U.S. at 482, 85 S.Ct. 1678.

13. *Id.* at 485, 85 S.Ct. 1678.

and integral to the relationship. Thus, caring for a spouse in the normal and expected manner could provide a basis for liability under the harboring and accessory statutes. Similarly, the statutes might create an incentive for terminating such normal care and support, in order to avoid liability. Thus, the statutes could conceivably operate directly on an intimate relation of a marriage and exert a maximum destructive impact upon it. In other words, basing a harboring or accessory conviction on normal and expected spousal conduct might well violate *Griswold.*

However, it does not follow that *Griswold* categorically bars harboring or accessory liability based on conduct between spouses. Unlike the *Griswold* statute, the harboring and accessory statutes do not "sweep unnecessarily broadly." [14] Harboring and accessory liability is limited to conduct *intended* to "prevent [the fugitive's] discovery or arrest," [15] or "to hinder or prevent [the fugitive's] apprehension, trial or judgment." [16] Thus, by their terms, the harboring and accessory statutes reach only conduct that is intended to frustrate law enforcement.[17] This conceptually simple proposition does not readily yield an easily applied rule for deciding cases, however, because intent is generally inferred from conduct. Thus, the core *Griswold* issue in the context of harboring and accessory liability is where lies the line between conduct that is normal spousal support and sharing of resources, and conduct that demonstrates an intent to frustrate law enforcement.

Fortunately, we need not, and do not, decide this question here. Hill's provision of shelter, employment, money, food and other material support to Charlie after he fled to Mexico, and while Hill and Charlie attempted to orchestrate Kimball's delivery of their possessions to Mexico, was self-evidently intended to assist Charlie in evading discovery or apprehension by law enforcement officials. In short, there can be no doubt that Hill intended to frustrate law enforcement efforts. Accordingly, we hold that the harboring and accessory statutes are not unconstitutional as applied to Hill. Because this is not a close case where we need to fully reconcile the harboring and accessory statutes with *Griswold,* we leave that task for another day.

## B. *Harboring Conviction*

In addition to her as-applied constitutional challenge, Hill assails her harboring conviction based on insufficiency of the evidence and on jurisdictional grounds. We reject these challenges as well.

### 1. *Sufficiency of Evidence.*

■■■ The harboring statute that Hill was convicted of violating, 18 U.S.C. § 1071, requires proof of four elements: "First, proof that a federal warrant had been issued for the fugitive's arrest. Second, that the Appellant had knowledge that a warrant had been issued.... Third, that the Appellant actually harbored or concealed [the fugitive]. Finally, that Appellant intended to prevent [the fugitive's]

---

**14.** *Griswold,* 381 U.S. at 485, 85 S.Ct. 1678.

**15.** 18 U.S.C. § 1071.

**16.** *Id.* § 3.

**17.** We also note that there is significant difference between the "importance of the government interests advanced" in the *Griswold* statutes and the harboring and accessory statutes

in this case. *Moore,* 431 U.S. at 499, 97 S.Ct. 1932. The purpose of the *Griswold* statute was to prevent contraception. *See Griswold,* 381 U.S. at 480, 85 S.Ct. 1678. The harboring and accessory statutes advance the orderly operation of the essential government functions of locating and apprehending criminals.

discovery or arrest."[18] There is sufficient evidence to support Hill's harboring conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found those essential elements beyond a reasonable doubt.[19] We hold that the evidence meets this standard.

That a felony arrest warrant was issued for Charlie is beyond peradventure. When Hill found out about it is less clear. The district court found that Hill learned of Charlie's felony indictment during the first week of January 1999. Nonetheless, Hill contends (without citation to the record) that "the government was unable to prove beyond a reasonable doubt that prior to January 15, 1999, [Hill] was aware that a felony warrant against Mr. Hill had issued." The only evidence we are able to find regarding timing is a statement by Vicki Powell that she apprised Hill of the felony warrant sometime around the first or second week of January, before Kimball left in the truck. Accordingly, we assume for the sake of argument that, to prove Hill guilty of felony harboring, the Government needed to prove that she harbored her husband after January 15, 1999. The Government did so.

■■■ Hill is correct that to have harbored or concealed her husband, she must have done more than give him money. Although supplying funds may make one an accessory after the fact, " '[s]upplying "financial assistance" to a fugitive does not rise to the level of harboring or conceal-

ing.' "[20] Courts draw a distinction, however, between paying money to a fugitive so that he may shelter, feed or hide himself, which is not harboring,[21] and providing that shelter, food, or aid directly, which is harboring. "[A]ny physical act of providing assistance, including food, shelter, and other assistance to aid the [fugitive] in avoiding detection and apprehension will make out a violation of section 1071."[22]

There is evidence that Hill provided Charlie food, shelter, and other assistance after January 15, 1999. On January 20, 1999, Hill paid $1,656 to the Araiza Inn, a hotel in Hermosillo, Mexico, where she and Charlie had stayed and dined for the two previous days. While in Hermosillo, Hill rented a car so she and Charlie could get around. If Hill had done these things in Cancun, Mexico, a vacation area far from the border, it would be more difficult to characterize these actions as harboring her husband because it would be very hard to show that they were done for the purpose of preventing his discovery or arrest. But Hill chose a border town, and she chose that town for a reason. The evidence showed that Charlie and Hill went together to Hermosillo to collect their pets and belongings, which Hill had previously arranged for Kimball to drive down from Oregon. In other words, Hill provided Charlie with food and shelter in northern Mexico so that he would not have to go back to the United States to retrieve their belongings himself, and she did so after she knew there was a felony warrant for his arrest. In light of this evidence, Hill's

18. *United States v. Yarbrough,* 852 F.2d 1522, 1543 (9th Cir.1988) (citations and internal quotation marks omitted).

19. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

20. *Yarbrough,* 852 F.2d at 1543 (quoting *United States v. Foy,* 416 F.2d 940, 941 (7th Cir. 1969)).

21. *See, e.g., United States v. Shapiro,* 113 F.2d 891, 892–93 (2d Cir.1940).

22. *Yarbrough,* 852 F.2d at 1543 (citation and internal quotation marks omitted).

conviction for harboring was sufficiently supported.

### 2. Extraterritorial Application of the Harboring Statute.

Because Hill harbored her husband in Mexico, we must decide whether the United States has extraterritorial jurisdiction to prosecute her. *United States v. Felix–Gutierrez*[23] teaches that it does. In *Felix–Gutierrez*, we considered whether the United States had extraterritorial jurisdiction over a defendant who was charged with being an accessory after the fact to the kidnapping and murder of a DEA agent in Mexico. We held that to determine whether a given statute has extraterritorial application, we examine (1) the statute's text for any indication that Congress intended it to apply extraterritorially and (2) compliance with principles of international law.[24] We also determined that "if the underlying substantive statute applies extraterritorially, the [accessory-after-the-fact statute] also applies extraterritorially when invoked in connection with an extraterritorial violation of the underlying statute." [25]

■ We discern no meaningful difference between Hill's harboring offense and the offenses of being an accessory after the fact, aiding and abetting, and conspiracy, all of which have been deemed to confer extraterritorial jurisdiction to the same extent as the offenses that underlie them.[26] Accordingly, if there is extraterritorial jurisdiction over violations of 18 U.S.C. § 228, the Deadbeat Parents Punishment Act, then there is extraterritorial jurisdiction over Hill's harboring offense.

■ Title 18 U.S.C. § 228 does not explicitly state that the United States has jurisdiction over anyone who violates the statute outside its borders. However, § 228(a)(2), which makes it a punishable offense to travel in interstate *or foreign commerce* with the intent to evade a support obligation,[27] makes plain the intent of Congress to apply the law internationally. Although Charlie was not charged under this particular subsection, the inclusion of the foreign commerce provision strongly suggests that Congress intended to cast a broad net and apply the statute to all offenders, whether or not they are found in the United States.

■ International law also supports extraterritorial application of the law in this instance. International law permits extraterritorial jurisdiction under five theories: territorial, national, protective, universality, and passive personality.[28] In the instant case, the territorial, national, and passive personality theories combine to sanction extraterritorial jurisdiction.

■■ Under the territorial jurisdiction theory, jurisdiction is appropriate if the acts performed outside the United States produce detrimental effects within the United States.[29] Charlie's alleged evasion

---

**23.** 940 F.2d 1200 (9th Cir.1991).

**24.** *Id.* at 1204.

**25.** *Id.* at 1205.

**26.** *See United States v. Layton*, 855 F.2d 1388, 1395 (9th Cir.1988) (collecting cases), *overruled on other grounds as recognized in Guam v. Ignacio*, 10 F.3d 608, 612 n. 2 (9th Cir. 1993).

**27.** 18 U.S.C. § 228(a)(2).

**28.** *See Felix–Gutierrez*, 940 F.2d at 1205. For a discussion of all five theories, see *United States v. Vasquez–Velasco*, 15 F.3d 833, 840 & n. 5 (9th Cir.1994).

**29.** *See Vasquez–Velasco*, 15 F.3d at 840; *Felix–Gutierrez*, 940 F.2d at 1205–06; *United States v. Peterson*, 812 F.2d 486, 493 (9th Cir.1987) (holding that an attempted transaction aimed at causing criminal acts within United States provides sufficient basis to exercise extraterritorial jurisdiction).

of child support payments has obvious detrimental effects within the United States because his children are United States citizens. Moreover, Hill's harboring conduct has prevented Charlie's apprehension. Thus, under the territorial theory, both parties' conduct supports jurisdiction.

 Extraterritorial jurisdiction is also proper under the nationality theory, which permits a country to apply its statutes to extraterritorial acts of its own nationals.[30] Because Charlie and Hill are both citizens of the United States, their criminal acts outside the United States may be punished in the United States.

 Finally, the passive personality theory, which bases jurisdiction on the nationality of the victim, sanctions extraterritorial application of the harboring statute in the instant case.[31] The victims here—Charlie's ex-wife, Victoria, and their children—are all United States citizens. Not surprisingly, the record shows that Charlie's failure to pay child support for twenty years had a significant negative impact on the victims' financial condition. Hill's harboring conduct prolonged their situation. Therefore, extraterritorial jurisdiction is appropriate under this theory as well.

Because a plain reading of the Deadbeat Parents Punishment Act clearly suggests congressional intent to confer extraterritorial jurisdiction and because such jurisdiction comports with international law, we hold that the United States properly prosecuted Hill in the District of Oregon for harboring her husband.

### C. Accessory Indictment and Conviction

 Hill argues that the indictment charging her with being an accessory after the fact is deficient as a matter of law because it did not specify the principal crime, Charlie's alleged violation of the Deadbeat Parents Punishment Act. To support her argument, Hill relies on United States v. Innie.[32] Innie concerned whether the defendant's prior conviction for being an accessory after the fact was a crime of violence that qualified him for sentencing as a career offender.[33] Because the crime underlying Innie's accessory offense was murder for hire, the Government argued that it should be considered a crime of violence. We agreed. In passing, we noted that because "[c]ommission of the underlying offense is a prerequisite for conviction as an accessory after the fact[,] ... an indictment charging one as an accessory after the fact must plead the underlying offense as well as the accessory offense." [34]

 In Innie, we were primarily concerned with ensuring, in a case in which a court planned to base a dramatic sentencing enhancement on a violent prior offense under the guidelines' career offender provisions, that a jury had found beyond a reasonable doubt that violence was an element of the crime.[35] The underlying offense was included in Innie's indictment. Thus, our statement there was dictum. Until now, whether the underlying offense is an essential element that must always

30. *United States v. Thomas*, 893 F.2d 1066, 1069 (9th Cir.1990).

31. *Vasquez–Velasco*, 15 F.3d at 840 n. 5.

32. 7 F.3d 840 (9th Cir.1993).

33. A defendant must have at least two prior felony convictions for crimes of violence or controlled substance offenses to be sentenced as a career offender. *Id.* at 849.

34. *Id.* at 850 (citation omitted).

35. Our concern was similar to that which the Supreme Court recently addressed in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

be pleaded in an accessory indictment in order to provide defendants with constitutionally adequate notice has not been squarely presented to this court. We hold that the underlying offense is an essential element that must be pleaded.

The Supreme Court has held that an indictment is sufficient if: (1) it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend; and (2) it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.[36] These requirements reflect the rights guaranteed by the Sixth[37] and Fifth[38] Amendments, respectively.

 So long as a statute's words "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished,"[39] an indictment that tracks the statute verbatim satisfies the above requirements. The question thus becomes, does the accessory statute set forth all the elements necessary to constitute the offense? We now hold that it does not.

The accessory statute provides that "[w]hoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact."[40] The first part of this statute, "knowing that an offense against the United States has been committed"[41] is intentionally ambiguous, and for good reason: It would be tremendously burdensome and inefficient to have a separate accessory statute for every possible principal crime. The phrase "a crime against the United States" simply fills in a blank for administrative ease; obviously, however, a conviction based on something so vague would not be constitutional.

 If a defendant may not be convicted of being an accessory to "a crime against the United States," with no underlying crime specified, then she should not be able to be indicted for the same. If an element is necessary to convict, it is also necessary to indict, because elements of a crime do not change as criminal proceedings progress. Thus, we concur with the First Circuit that "an indictment charging one as an accessory after the fact must plead the underlying offense ... as well as the accessory offense."[42]

## CONCLUSION

Because we hold that it is constitutional for the United States to prosecute Hill for harboring her husband and because there was sufficient evidence to convict her of that crime, we affirm her harboring conviction. We reverse her conviction for being an accessory after the fact because her

---

36. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

37. U.S. CONST. amend.VI (providing that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation").

38. U.S. CONST. amend. V (protecting against double jeopardy).

39. *United States v. Carll,* 105 U.S. 611, 612, 26 L.Ed. 1135 (1882).

40. 18 U.S.C. § 3 (2001).

41. *Id.*

42. *See United States v. McLennan,* 672 F.2d 239, 243 (1st Cir.1982) (holding that the defendant's accessory indictment, which pleaded that the principal's crime was bail jumping, but not that the bail jumping was willful, was constitutionally sufficient).

indictment was insufficient as a matter of law.

AFFIRMED in part, REVERSED in part, and REMANDED for entry of an amended judgment.