# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Filed May 9, 2005

No. 04-3037

United States of America,
Appellant

v.

Sabri Yakou,
Appellee

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00449-01)

———

**BEFORE**:   Henderson* and Rogers, Circuit Judges, and
Williams, Senior Circuit Judge

## O R D E R

Upon consideration of the appellant's motion to clarify the opinion, the opposition thereto, and the reply, it is

**ORDERED** that the motion be granted in part and denied in part. It is

**FURTHER ORDERED** that the opinion in *United States v. Yakou*, 393 F.3d 231 (D.C. Cir. 2005), be amended as follows:

Page 234, second paragraph, lines 22-23, delete "Because" and capitalize the letter "i" in the word "it"

Page 234, second paragraph, line 24, delete "and"

Page 234, second paragraph, line 27, after the comma insert "and that the United States does not argue that he is otherwise subject to the jurisdiction of the United States for the purposes of ITAR. Therefore,"

Page 243, first full paragraph, line 28, after "States" insert "or otherwise subject to the jurisdiction of the United States"

Page 243, first full paragraph, lines 34-35, delete "Brokering Amendment and the ITAR. *See id.*" and insert in lieu thereof "ITAR unless "otherwise subject to the jurisdiction of the United States." *Id*. As noted, the United States does not argue that Yakou is "otherwise subject to the jurisdiction of the United States." "

Page 243, second paragraph, line 10, after "States" insert "or otherwise subject to the jurisdiction of the United States"

**Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:

Deputy Clerk

*Circuit Judge Henderson continues to concur in the judgment.

Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 4, 2004        Decided January 4, 2005
Revised May 9, 2005

No. 04-3037

United States of America,
Appellant

v.

Sabri Yakou,
Appellee

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00449-01)

———

*Lisa H. Schertler*, Assistant U.S. Attorney, argued the cause for appellant. With her on the briefs were *Kenneth L. Wainstein*, U.S. Attorney, and *John R. Fisher*, *Wendy L. Wysong*, and *Laura A. Ingersoll*, Assistant U.S. Attorneys. *Roy W. McLeese III*, Assistant U.S. Attorney, entered an appearance.

*Matthew M. Hoffman* argued the cause for appellee.  With him on the brief was *John Moustakas*.

Before:  HENDERSON and ROGERS, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Opinion concurring in the judgment filed by *Circuit Judge* HENDERSON.

ROGERS, *Circuit Judge*:  The United States appeals the dismissal of the indictment alleging that Sabri Yakou engaged in brokering activities in violation of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778(b)(2), (c) (2000), and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 129.2(a)-(b), -.3, -.5 to -.7 (2004).  The United States contends that the district court made three errors of law by: dismissing the indictment before trial, when the Federal Rules of Criminal Procedure do not provide a mechanism for summary judgment; ruling that lawful permanent resident ("LPR") status can change without formal administrative action by immigration officials, such that Yakou was not a "U.S. person," as defined by the ITAR, who is subject to prosecution for brokering activities; and ruling that Yakou could not be indicted separately under 18 U.S.C. § 2 as an aider and abettor of his son's alleged brokering violations.  This court has jurisdiction pursuant to 18 U.S.C. § 3731, and we affirm the dismissal of the indictment.

## I.
## A.

The AECA authorizes the President to establish the "United States Munitions List," 22 U.S.C. § 2778(a)(1), which includes "defense articles" and "defense services" whose import and

export is subject to registration and licensing requirements, *id*. § 2778(b). It authorizes the President "to promulgate regulations for the import and export of [defense] articles and services." *Id.* § 2778(a)(1). The registration and licensing requirements originally extended only to those individuals "engage[d] in the business of manufacturing, exporting, or importing" the articles and services on the Munitions List. *Id*. § 2778(b)(1)(A)(i); *see also id.* § 2778(b)(2). In 1996, however, Congress enacted the Brokering Amendment, which expanded the scope of the AECA's registration and licensing requirements to cover "every person . . . who engages in the business of brokering activities with respect to the manufacture, export, import, or transfer of" the articles and services on the Munitions List. *Id.* § 2778(b)(1)(A)(ii)(I). The Brokering Amendment defines "brokering activities" as "the financing, transportation, freight forwarding, or taking of any other action that facilitates the manufacture, export, or import of a defense article or defense service." *Id.* § 2778(b)(1)(A)(ii)(II). Willful violation of the Brokering Amendment and its implementing regulations is subject to criminal prosecution with imprisonment upon conviction for up to ten years and a fine of not more than one million dollars. *Id.* § 2778(c).

The ITAR, promulgated by the State Department pursuant to Executive Order 11,958, 42 Fed. Reg. 4311 (Jan. 18, 1977), defines the class of persons subject to the licensing and registration requirements of the Brokering Amendment as "[a]ny U.S. person, wherever located, and any foreign person located in the United States or otherwise subject to the jurisdiction of the United States." 22 C.F.R. § 129.3(a).[1] In so construing the

---

[1] Section 129.3(a) provides:

Any U.S. person, wherever located, and any foreign person located in the United States or otherwise subject to the jurisdiction of

4

Brokering Amendment's reference to "every person," 22 U.S.C. § 2778(b)(1)(A)(ii)(I), the ITAR reflects the legislative history revealing that in enacting the Brokering Amendment Congress was focusing on "U.S. persons" and "foreign persons located in the [United States]," and was concerned particularly with "U.S. persons [who] are involved in arms deals that are inconsistent with U.S. policy." H.R. REP. NO. 104-519(I), at 11, 12 (1996) [hereinafter HOUSE REPORT]. It is undisputed that Yakou is not a United States citizen, that the indictment does not allege that Yakou engaged in brokering activities within the United States, and that the United States does not argue that he is otherwise subject to the jurisdiction of the United States for purposes of the ITAR. Therefore, the United States must show that Yakou is a "U.S. person." The ITAR defines a "U.S. person" as one "who is [a] lawful permanent resident as defined by 8 U.S.C. 1101(a)(20) [the Immigration and Nationality Act ("INA")]." 22 C.F.R. § 120.15. The cross-referenced provision of the INA, in turn, defines the term "lawfully admitted for permanent residence" as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C.A. § 1101(a)(20) (2004).

## B.

The material facts were undisputed in the district court. Sabri Yakou was born in 1934 in Iraq, and he predominately

---

the United States (notwithstanding § 120.1(c)), who engages in the business of brokering activities (as defined in this part) with respect to the manufacture, export, import, or transfer of any defense article or defense service subject to the controls of this subchapter (see § 121) or any "foreign defense article or defense service" (as defined in § 129.2) is required to register with the Office of Defense Trade Controls.

22 C.F.R. § 129.3(a).

lived there until the mid-1970s when he moved with his family to Great Britain. In 1986, Yakou followed his children to the United States, where he began to live and work pursuant to a L-1 visa. In 1989, his application for LPR status in the United States was approved, and he was issued a "green card." A few years later, he was naturalized in the United Kingdom and received a British passport, although he retained his Iraqi citizenship.

In early 1993, federal law enforcement agents searched Yakou's home and business in California and seized personal papers as well as business files, records, and equipment. Yakou believed that he had been mistreated by the United States, and he decided that he would no longer live in this country. He so informed his wife and children. Yakou resumed living in London, primarily residing there from that time until 1998, at which point he returned to Baghdad. He has lived and worked in Iraq ever since, establishing a new personal life there as well. By 1994, Yakou no longer owned any real property in the United States. He has not worked in the United States since 1993, and he last filed a federal income tax return in 1992.

The parties disagree, however, on the legal significance of the following circumstances. Although Yakou has not lived in the United States in over ten years, he never formally renounced his LPR status by filing Form I-407, "Abandonment of Lawful Permanent Resident Status," with United States immigration authorities. Neither has the Board of Immigration Appeals ("BIA") adjudged that his LPR status has changed. Since early 1993, Yakou has returned to the United States on less than ten occasions for no more than a few weeks at a time. These trips appear predominately, if not exclusively, to have involved visiting his family, and he stayed with family members while in the United States. Prior to January 2000, however, Yakou used his "green card," which indicates LPR status, to enter the

country. At this point, he apparently lost the card, and, although he may have requested a new card, he was admitted on his British passport during his last three visits to the United States.

Yakou voluntarily returned to the United States in October 2003 only when a federal agent from Immigration and Customs Enforcement contacted him while he was on business in Thailand and suggested that he could assist his son, Regard, who had been arrested in Iraq on brokering charges and would be transported to the United States. Upon his arrival in the United States, Yakou was arrested pursuant to a previously sealed indictment. The single-count indictment alleges that Yakou and his son engaged in brokering activities involving defense articles and defense services with the government of Iraq without obtaining written approval from the State Department, in violation of the AECA, 22 U.S.C. § 2778(b)(2), (c), the ITAR, 22 C.F.R. §§ 129.2(a)-(b), -.3, -.5 to -.7, and 18 U.S.C. § 2. Specifically, the indictment alleges that in Iraq, from approximately November 2000 to July 2003, Yakou and his son negotiated and arranged for the sale, purchase, transfer, and construction of six armored patrol boats for the government of Iraq in return for a fee, commission, and other consideration. While the indictment does not allege that either Yakou or his son is a "U.S. person," it is undisputed that Yakou's son is a United States citizen.

In the district court, Yakou moved to dismiss the indictment under Rules 7 and 12 of the Federal Rules of Criminal Procedure. Observing that the indictment appeared to be "poorly drafted," Yakou understood it to allege violation of five regulations issued under the Brokering Amendment, and he argued that he could not have violated those regulations as a matter of law because after abandoning his LPR status in 1993 he was no longer a "U.S. person." He noted that it was

undisputed that the conduct identified in the indictment took place outside the United States. Yakou also moved to strike the indictment's reference to 22 U.S.C. § 2778(b)(2) because the indictment did not allege an offense under that provision. In opposition to the motion, the United States did not contest Yakou's interpretation of the indictment but argued, as it does on appeal, that Yakou's LPR status could change only through an administrative procedure, either by filing Form I-407 or by formal adjudication of his status by the BIA. In addition, Yakou advanced a variety of reasons why the aiding and abetting charge was invalid, including that there was no meaningful distinction in the statutory text between aiding and abetting and violating the statute as a principal, that Congress did not intend to regulate the overseas brokering activities of non-U.S. persons, and that an aiding and abetting theory would violate international law. The United States responded that the district court had jurisdiction over Yakou as an aider and abettor notwithstanding his citizenship and residency because one can be prosecuted as an aider and abettor even if one is incapable of violating the statute as a principal.

The district court, while adopting the parties' construction of the indictment, rejected the United States's position that the loss of LPR status can occur only through administrative action by immigration officials. It initially refused to dismiss the indictment, however, because Yakou had not demonstrated that his LPR status had changed. Upon reconsideration, the district court reversed course, stating that it had improperly shifted the burden to Yakou to demonstrate that he was no longer a "U.S. person." The United States agreed that it carried the burden of proving that Yakou was a "U.S. person," but argued, as it does on appeal, that it met its burden by demonstrating that LPR status continues until there has been formal administrative action changing that status. Upon reexamining Yakou's arguments, the district court ruled that because Yakou had voluntarily

relinquished his LPR status prior to the period alleged in the indictment, he was no longer a "U.S. person" against whom brokering charges may be brought. The district court also ruled that Yakou could not be prosecuted under 18 U.S.C. § 2 as an aider and abettor of his son's alleged brokering violations because "facilitating" a brokering act, which is a violation of the Brokering Amendment, is equivalent to aiding and abetting such an act and thus cannot be used as a separate basis for establishing jurisdiction over him.

## II.

This court reviews *de novo* the district court's dismissal of an indictment based on questions of law. *See, e.g.*, *United States v. Marks*, 379 F.3d 1114, 1116 (9th Cir. 2004); *United States v. Atandi*, 376 F.3d 1186, 1188 (10th Cir. 2004). On appeal, the United States contends that the district court erred by dismissing the indictment before trial, when the Federal Rules of Criminal Procedure do not provide a mechanism for summary judgment, by ruling that LPR status can change without administrative action by immigration officials, such that Yakou was not a "U.S. person," as defined by the ITAR, who is subject to prosecution for brokering activities, and by ruling that Yakou could not be indicted separately under 18 U.S.C. § 2 as an aider and abettor of his son's alleged violations of the brokering provisions. The United States does not contend that, notwithstanding the district court's ruling on Yakou's loss of LPR status, the indictment charges a valid offense against him as a principal under 22 U.S.C. § 2778(b)(2); the district court did not rule on that issue, and we do not address it.

## A.

Pretrial dismissal of indictment. There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context. *See, e.g.*, *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000); *United States v. Nabors*, 45 F.3d 238, 240 (8th Cir. 1995). Instead, Rule 12(b) of

the Federal Rules of Criminal Procedure provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." The "general issue" has been defined as "evidence relevant to the question of guilt or innocence." *United States v. Ayarza-Garcia*, 819 F.2d 1043, 1048 (11th Cir. 1987) (citing *United States v. Barletta*, 644 F.2d 50, 58 (1st Cir. 1981)).

While Rule 12(b) does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds, the United States failed to object in the district court to its pretrial determination of whether Yakou was a "U.S. person" covered by the Brokering Amendment and the ITAR. Indeed, the United States provided Yakou with discovery regarding his pretrial jurisdictional claim and also introduced evidence to bolster its claim that Yakou retained his LPR status, quite possibly because it would have been unable to appeal a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure as jeopardy would have attached, *see United States v. Alfonso*, 143 F. 3d 772, 777 n. 7 (2d Cir. 1998). Several circuits have upheld, in the absence of a government objection, the district court's pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds where the material facts are undisputed and only an issue of law is presented. *See United States v. Phillips*, 367 F.3d 846, 855 & n.25 (9th Cir. 2004); *United States v. Hall*, 20 F.3d 1084, 1087-88 (10th Cir. 1994); *United States v. Levin*, 973 F.2d 463, 470 (6th Cir. 1992); *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988). Other circuits have recognized that a district court can properly adjudge the sufficiency of the evidence before trial where the government has made a full proffer of evidence or where there is a stipulated record, situations similar to the undisputed facts at issue here. *See DeLaurentis*, 230 F.3d at 660-61 (3d Cir.); *Alfonso*, 143 F.3d at 776-77 (2d Cir.); *cf. Nabors*, 45 F.3d at 240 (8th Cir.). Only the Eleventh Circuit has held that even where there are

undisputed facts a district court may not engage in a pretrial determination of the sufficiency of the evidence, *see United States v. Salman*, 378 F.3d 1266, 1267-69 (11th Cir. 2004), but there was no indication that the government failed to object in the district court. Although this court has not directly spoken on the issue, it has upheld a pretrial dismissal of counts of an indictment based on a question of law. *See, e.g.*, *United States v. Espy*, 145 F.3d 1369, 1370 (D.C. Cir. 1998); *United States v. Oakar*, 111 F.3d 146, 147-50 (D.C. Cir. 1997).

The United States's procedural challenge to the district court's pretrial ruling is untimely under well-established principles of waiver, *see, e.g.*, *United States v. Hylton*, 294 F.3d 130, 135-36 (D.C. Cir. 2002), and the existence of undisputed facts obviated the need for the district court to make factual determinations properly reserved for a jury, *see, e.g.*, *Phillips*, 367 F.3d at 855 n.25; *United States v. Korn*, 557 F.2d 1089, 1090 (5th Cir. 1977). Although it is an "unusual circumstance[]" for the district court to resolve the sufficiency of the evidence before trial because the government is usually entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure, *Risk*, 843 F.2d at 1061, we join those circuits in upholding the district court's pretrial dismissal of the indictment based on a question of law where the government has not made a timely objection.

**B.**

LPR status. The INA, the Brokering Amendment, and the ITAR are all silent regarding the manner and the point at which LPR status changes. While 8 U.S.C. § 1101(a)(27)(A) defines the "special immigrant[s]" exempt from numerical caps on entry as, *inter alia*, LPRs who have been out of the country for a "temporary visit abroad," neither it nor other provisions of the INA address when LPR status ceases to exist or whether certain

procedures must take place to effect a change of status. The Attorney General, by regulation, has created the BIA in the Justice Department's Executive Office for Immigration Review to interpret the immigration laws. 8 C.F.R. § 1003.1(a)(1) (2004). While the administrative and enforcement responsibilities for the INA are divided among the President, the Attorney General, the Secretary of Homeland Security, and the Secretary of State, among others, the Attorney General's interpretations and rulings "with respect to all questions of law shall be controlling." 8 U.S.C.A. § 1103(a). Further, while the Attorney General retains the authority to review and modify BIA decisions, *see id.* § 1103(g)(2); 8 C.F.R. § 1003.1(g)-(h), absent such a modification, BIA decisions are binding on all immigration judges and officers and employees of the Department of Homeland Security, *see id.* § 1003.1(g). The Supreme Court, recognizing the BIA's expertise over immigration matters and its power to exercise the Attorney General's statutory authority to interpret the immigration laws, has applied the principles of deference articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 841 (1984), to BIA decisions. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999). Accordingly, we examine the BIA's decisions to determine if Yakou's position that his LPR status changed in 1993 is inconsistent with BIA precedent.

Numerous BIA decisions express in dicta the BIA's view that LPR status can change outside the formal adjudicatory process associated with removal. These decisions distinguish between an involuntary termination of status as a result of removal proceedings and a voluntary change in status outside those proceedings. For example, in *Matter of Lok*, 18 I. & N. Dec. 101 (BIA 1981), after ruling that it would "deem[] the lawful permanent resident status of an alien to end with the entry of the final administrative order of deportation," *id.* at 105, the BIA explained that "[o]ther circumstances under which lawful

permanent resident status may change include: . . . when [one] relinquishes such status, intentionally or unintentionally," *id.* at 107 n.8 (internal citations omitted). Similarly, in *Matter of Duarte*, 18 I. & N. Dec. 329 (BIA 1982), the BIA stated that in addition to a final administrative order of exclusion and deportation, a person could "have been . . . divested of his lawful permanent resident status . . . through abandonment, intentional or unintentional." *Id.* at 332 & n.3; *see also Matter of Gunaydin*, 18 I. & N. Dec. 326, 327 & n.1 (BIA 1982); *Matter of Kane*, 15 I. & N. Dec. 258, 260 & n.1 (BIA 1975). Thus, in adjudicating an individual's LPR status, the BIA has expressed its understanding that the status changes at the point a LPR engages in an abandoning act, like departing the United States for more than a "temporary visit abroad," 8 U.S.C. § 1101(a)(27)(A), not at the point when the BIA makes a determination of the person's status in a removal proceeding or when the individual files Form I-407. For instance, in *Matter of Kane*, the BIA found that a LPR's status "ha[d] already changed because her trip or trips [abroad] were not temporary." 15 I. & N. Dec. at 265 n.3. The BIA explained, "If any of her absences have been other than temporary in nature, she has lost the status of lawfully admitted immigrant and would not now have that status." *Id.* Similarly, in *Matter of Montero*, 14 I. & N. Dec. 399 (BIA 1973), the BIA found that a LPR "lost" her status at the point "she departed . . . with no fixed intent to return" to the United States. *Id.* at 401; *see also Matter of Huang*, 19 I. & N. Dec. 749, 757 (BIA 1988).

None of these cases, however, are similar to Yakou's circumstances. Yakou has not been subject to removal proceedings; nor has he sought readmission to the United States by means of a reentry permit or a returning resident's visa; nor has he filed Form I-407. To the extent the BIA has expressed its general interpretation of the INA in these cases, it was not required to apply its interpretation of voluntary abandonment of LPR status, thus leaving only dicta that is helpful, but not

dispositive of Yakou's contention that his status changed in 1993. It is nonetheless true, however, that the BIA has rejected the notion that it must "overlook" abandonment of LPR status where there has been no formal administrative action. *Matter of Abdoulin*, 17 I. & N. Dec. 458, 460 (BIA 1980). In that case, the BIA affirmed the denial of a visa for the wife of a purported LPR after he had been absent from the United States for eleven years. Despite the fact that there were no formal proceedings adjudicating the abandonment of his LPR status and although he could still test the continuation of that status before the BIA, the BIA ruled that he had failed to meet his burden to show his status continued, and it declined to afford him the benefits of that status, thus implicitly recognizing that his LPR status had already changed as a result of his ceasing to live in the United States.

While the United States maintains these BIA decisions were ruling only that a loss of LPR status is irreversible, none of them suggest that the only way that one can voluntarily relinquish or abandon LPR status is by filing Form I-407. There is no regulation indicating that Form I-407 is required to change LPR status, and Form I-407 itself allows individuals to indicate either that they are seeking to abandon their LPR status or that they already "have abandoned [that] status" prior to filing the Form. The United States relies on a legal opinion from the Acting General Counsel of the Immigration and Naturalization Service ("INS") stating that a LPR "remains a lawful permanent resident until the Government proves otherwise in deportation or exclusion proceedings against him or her, or until the petitioner voluntarily abandons residence and adjusts to nonimmigrant status [regarding diplomatic occupations under 8 U.S.C. § 1257], or leaves the United States and executes a Form I-407, Abandonment of Lawful Permanent Resident Status." 1 INS & DOJ Legal Opin. § 91-2 (Jan. 9, 1991) (internal citations omitted). Whatever its legal merit, the opinion does not address Yakou's circumstances.

There is yet another reason for adopting Yakou's position that LPR status can change without formal administrative action: not only is there no regulatory indication that formal administrative action is required before a LPR can voluntarily relinquish that status, but it is consistent with Congress's determination that United States citizenship may be lost automatically, without any administrative or judicial determination, when a person has voluntarily engaged in certain conduct with the requisite intent. *See* 8 U.S.C. §§ 1481, 1488 (2000); *see also United States ex rel. Marks v. Esperdy*, 315 F.2d 673, 676 (2d Cir. 1963), *aff'd by an equally divided court*, 377 U.S. 214 (1964); *cf. Afroyim v. Rusk*, 387 U.S. 253, 268 (1967). There are no exceptions listed in § 1481 or § 1488 requiring administrative or judicial determinations before citizenship is lost as might lend support to the United States's view that a formal adjudication or filing is required before a change in LPR status can occur. The United States relies on *United States v. Grimley*, 137 U.S. 147, 151-52 (1890), to support the proposition that Yakou's "breach" of LPR status (by reason of his alleged violation of the AECA and the ITAR and departure from the United States) cannot be used to escape criminal liability. But *Grimley* is inapposite; under the ITAR, LPR status turns on immigration law, and the United States fails to show that LPR status operates in a way comparable to the military relationship at issue in *Grimley*.

The United States's reliance on a 1996 revision to a regulation defining LPR status, which provides that "[s]uch [LPR] status terminates upon entry of a final administrative order of exclusion, deportation, or removal," 8 C.F.R. § 1.1(p) (2004), is likewise misplaced. The Justice Department indicated in response to comments about the 1996 amendment to 8 C.F.R. § 1.1(p) that the amendment was intended to codify the *Lok* rule that is identical to the added text. *See* 61 Fed. Reg. 18,900, 18,900 (Apr. 29, 1996). Adopted to provide "finality in

immigration proceedings," *id.*, the language upon which the United States now relies was intended to apply only to proceedings brought against a LPR, and it does not foreclose a change in status by means other than formal termination. In other words, "termination" of LPR status under 8 C.F.R. § 1.1(p) is only a subset of the "change" of such status mentioned in the INA, 8 U.S.C. § 1101(a)(20), and does not address the totality of the means by which Yakou's LPR status could change.

No more persuasive is the United States's contention that permitting LPR status to change at the time an abandoning act occurs outside of a formal administrative proceeding is inconsistent with 8 C.F.R. § 235.3(b)(5)(ii), which recognizes an individual who has abandoned LPR status as a "verified lawful permanent resident" when he or she attempts to reenter the United States. While this accurately states the regulation, it does not conflict with Yakou's contention that he abandoned his LPR status in 1993 and his status changed at that time. If a putative LPR "has abandoned or relinquished that status," then, upon return to the United States, he is "regarded as seeking an admission" to the country, 8 U.S.C. § 1101(a)(13)(C), and he "must undergo an inspection as though an arriving alien," *Alaka v. Elwood*, 225 F. Supp. 2d 547, 553 (E.D. Pa. 2002). Although such an individual would be considered a "verified lawful permanent resident" if the United States's data systems or other available means so indicated, *see* 8 C.F.R. § 235.3(b)(5)(i), and that would prevent his removal under expedited proceedings because he is not clearly inadmissible, *see id.* § 235.3(b)(5)(ii), he can still be subject to a regular removal proceeding under 8 U.S.C. § 1229a on the ground that he is no longer a LPR because his status has changed, *see id.* While Yakou would contingently retain his LPR status throughout a removal proceeding in an effort to preserve his rights should he ultimately be found to have retained that status, there is no reason to attach that status to him in a criminal proceeding where he disclaims it and the

undisputed facts would compel a finding of abandonment.

Whatever administrative complexity might result in the absence of formal LPR abandonment proceedings, it arises directly from the regulatory scheme for recognizing LPR status derived from the immigration laws and indirectly from Congress's decision to terminate United States citizenship automatically in certain instances without concern for the regulatory implications of an undocumented change of status. The United States's suggestion that a federal court's determination of Yakou's status interferes with the separation of powers under which immigration matters are largely within the province of the Executive Branch, *see Oloteo v. INS*, 643 F.2d 679, 680 (9th Cir. 1981), obscures the fact that the court is not changing Yakou's LPR status; rather, the court is looking, as the ITAR directs, *see* 22 C.F.R. § 120.15, to 8 U.S.C. § 1101(a)(20) as interpreted by the BIA to determine whether Yakou's LPR status changed over ten years ago when he departed the United States for more than a "temporary visit abroad," 8 U.S.C. § 1101(a)(27)(A). The cases relied upon by the United States are to no avail. In *United States v. Ryba*, 441 F.2d 1137 (3d Cir. 1971), the LPR was seeking to have his selective service board change his status, as opposed to claiming that his status had already changed. And *Foy v. Schantz, Schatzman & Aaronson, P.A.*, 108 F.3d 1347, 1349 (11th Cir. 1997), is inapposite because the court determined that "Congress intended to import" the INA's definition of LPR into the diversity jurisdiction statute, 28 U.S.C. § 1332(a) (2000), to determine whether a person is a "citizen of a State"; to find that Foy, who had not been granted LPR status pursuant to the INA, was a "citizen of a State" for purposes of diversity jurisdiction, a court would have had to act beyond its authority by conferring LPR status on him.

Having determined that nothing in the BIA's decisions

interpreting 8 U.S.C. § 1101(a)(20) is adverse to Yakou's position that LPR status can change outside removal proceedings and without filing Form I-407, the question remains whether the United States has met its burden to show that Yakou maintained his LPR status through November 2000, the beginning of the period alleged in the indictment. To qualify as a LPR upon seeking reentry into the United States, Yakou "must have acquired lawful permanent resident status in accordance with our laws, must have retained that status from the time he acquired it, and must be returning to an 'unrelinquished lawful permanent residence' after a 'temporary visit abroad.'" *Matter of Huang*, 19 I. & N. Dec. at 753, *quoted in Singh v. Reno*, 113 F.3d 1512, 1514 (9th Cir. 1997). The inquiry into whether Yakou left the United States for only a "temporary visit abroad" is relatively easy. Yakou departed the United States in 1993 with the intent to never live here again. He moved to London, where he resided until 1998, and then he returned to his native Iraq where he has lived ever since. Although during the past eleven years he has traveled to the United States approximately nine times to visit his family, he has stayed for only a few weeks during each visit. These infrequent and short stays in the United States are insufficient, as a matter of law, to support retention of his LPR status. *See, e.g.*, *Singh*, 113 F.3d 1512; *Matter of Huang,* 19 I. & N. Dec. 749; *Matter of Kane*, 15 I. & N. Dec. 258; *cf. Aleem v. Perryman*, 114 F.3d 672, 677 (7th Cir. 1997). The fact that Yakou used his "green card" on several of these occasions to enter the United States prior to 2000 is immaterial; the relevant inquiry is not whether he may have wanted to retain his LPR status, but whether his actions show that he has abandoned that status. *See Matter of Kane*, 15 I. & N. Dec. at 265.

Based on undisputed facts about Yakou's whereabouts since 1993, we hold that because Yakou's LPR status changed after he left the United States in 1993, the United States has failed to demonstrate that Yakou was a "U.S. person" during the period

alleged in the indictment. The district court therefore properly dismissed the indictment alleging that Yakou violated the Brokering Amendment and the ITAR as a principal.

## C.

Aiding and Abetting. The federal aiding and abetting statute provides, in relevant part, that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a) (2000); *see also United States v. Wilson*, 160 F.3d 732, 738 (D.C. Cir. 1998). The statute "typically applies to any criminal statute unless Congress specifically carves out an exception that precludes aiding and abetting liability," *United States v. Angwin*, 271 F.3d 786, 802 (9th Cir. 2001), and it long has been established that a person can be convicted of aiding and abetting another person's violation of a statute even if it would be impossible to convict the aider and abettor as a principal. *See, e.g.*, *In re Nofziger*, 956 F.2d 287, 290 (D.C. Cir. 1992); *United States v. Raper*, 676 F.2d 841, 849 (D.C. Cir. 1982); *see also Coffin v. United States*, 156 U.S. 432, 447 (1895).

The aiding and abetting statute, however, is not so broad as to expand the extraterritorial reach of the underlying statute. In the cases cited by the United States – aiding and abetting by private citizen of police officers' violations of civil rights, *see United States v. Lester*, 363 F.2d 68, 72-73 (6th Cir. 1966), aiding and abetting by United Nations' employee exempt from registration requirements of United States citizen's failure to register as a foreign agent, *see United States v. Melekh*, 193 F. Supp. 586, 592 (N.D. Ill. 1961), aiding and abetting by adult of minor's unlawful possession of alcohol, *see State v. Norman*, 229 N.W.2d 55, 56 (Neb. 1975), aiding and abetting by deputy sheriff of prisoners' forbidden sex acts, *see People v. Fraize*, 43 Cal. Rptr. 2d 64, 65-66 (Cal. Ct. App. 1995) – the evil sought to be averted inherently relates to, and indeed requires, persons

in certain categories. Here, by contrast, the United States can be hurt every bit as much by brokering activities without "U.S. persons" as with them. Accordingly, the congressional choice to limit liability to "U.S. persons," is highly significant and inconsistent with catching the non-U.S. person who happens to engage in brokering activities with a "U.S. person."

Congress legislates against the backdrop of the presumption against extraterritoriality, *see, e.g.*, *EEOC v. Arabian Am. Oil Co.* ("*ARAMCO*"), 499 U.S. 244, 248 (1991), and absent an indication from Congress to the contrary, the crime of aiding and abetting "confer[s] extraterritorial jurisdiction to the same extent as the offense[] that underlie[s it]." *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002); *cf. United States v. Yousef*, 327 F.3d 56, 87-88 (2d Cir. 2003); *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1205 (9th Cir. 1991); *United States v. Layton*, 855 F.2d 1388, 1395-96 (9th Cir. 1988). Federal laws are deemed to apply only to the territorial jurisdiction of the United States unless Congress provides "affirmative evidence" to the contrary, *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 176 (1993), which is "clearly expressed," *ARAMCO*, 499 U.S. at 248; *see also United States v. Delgado-Garcia,* 374 F.3d 1337, 1344-45 (D.C. Cir. 2004).

While the text of the Brokering Amendment refers to "every person," 22 U.S.C. § 2778(b)(1)(A)(ii)(I), Congress has expressed its intent to limit the extraterritorial reach of the Brokering Amendment and thus the ITAR to "U.S. persons." The legislative history of the Brokering Amendment indicates that Congress targeted this class of persons, and, more specifically, that Congress recognized that "U.S. persons are involved in arms deals that are inconsistent with U.S. policy." HOUSE REPORT at 11, 12. In the Brokering Amendment, then, Congress was concerned with both United States brokers of arms

and foreign brokers of arms located in the United States, but not with foreign brokers located outside the United States, *see id.*, even though each type of individual could be involved in brokering activities affecting the United States. The ITAR, in turn, reflects Congress's intent that the Brokering Amendment apply extraterritorially solely to "U.S. persons." Under the ITAR, the Brokering Amendment applies only to "U.S. person[s], wherever located, and any foreign person located in the United States or otherwise subject to the jurisdiction of the United States." 22 C.F.R. § 129.3(a). The ITAR's structure and text make clear that registration requirements vary based on the individual's relationship with the United States, and that foreign brokers located and acting outside the United States were not intended to be covered by the ITAR unless "otherwise subject to the jurisdiction of the United States." *Id.* As noted, the United States does not argue that Yakou is "otherwise subject to the jurisdiction of the United States."

To adopt the United States's position that Yakou can be charged with aiding and abetting alleged brokering activities in Iraq, even if Congress and the implementing regulations did not contemplate such coverage, would greatly expand the scope of the registration and licensing requirements by regulating not just "U.S. person[s], wherever located, and any foreign person located in the United States or otherwise subject to the jurisdiction of the United States," 22 C.F.R. § 129.3(a), but also regulating non-U.S. persons located and acting outside the United States. Congress has not expressed with the requisite clarity that it sought to apply the Brokering Amendment and, by extension the ITAR's brokering provisions, in such an extraterritorial manner, *see ARAMCO*, 499 U.S. at 248; *Delgado-Garcia,* 374 F.3d at 1344-45; *Nieman v. Dryclean U.S.A. Franchise Co.*, 178 F.3d 1126, 1129 (11th Cir. 1999), as a non-U.S. person outside the United States is not punishable as a principal except where subject to the jurisdiction of the United

21

States, *see* 22 C.F.R. § 129.3(a); HOUSE REPORT at 11. Accordingly, while the Brokering Amendment and the ITAR have extraterritorial effect for "U.S. persons," they do not have such effect for "foreign persons," like Yakou, whose conduct occurs outside the United States. To apply the aiding and abetting statute to Yakou's conduct in Iraq would confer extraterritorial jurisdiction far beyond that which is available directly under the Brokering Amendment and the ITAR. While the AECA has been described as "inherently international in scope," *United States v. Evans*, 667 F. Supp. 974, 981, 985 (S.D.N.Y. 1987), in that case the court was concerned with the transfer of American-made weapons that were exported from the United States; no such allegation appears in Yakou's indictment, which refers only to brokering  activities in Iraq, and the United States makes no such claim on appeal.

The other cases on which the United States relies are also distinguishable. *Felix-Gutierrez* and *Hill* involved statutes that do not differentiate between persons who are subject to extraterritorial jurisdiction. Because Congress sought extraterritorial effect for the statutes in *Felix-Gutierrez* and *Hill*, they apply extraterritorially to any person who violates their provisions and thus to any person who aids and abets a violation. The Brokering Amendment and the ITAR, however, apply extraterritorially to Yakou only if he is a "U.S. person." While there is some tension between the presumption against extraterritoriality and the principle that aiders and abetters need not be able to be convicted as principals, the presumption against extraterritoriality, which recognizes courts' limited foreign policy expertise, *see ARAMCO*, 499 U.S. at 248, should control. Given the legislative history of the Brokering Amendment, as reflected in the ITAR, it reasonably follows that Congress and the State Department did not go to such lengths to exclude non-U.S. persons located outside the United States from direct extraterritorial liability under the Brokering Amendment only to

permit these same persons to be charged under an aiding-and-abetting statute for the identical conduct that they have determined should not result in their punishment as principals. Although *United States v. Beck*, 615 F.2d 441 (7th Cir. 1980), upheld the conviction of a South African national for aiding and abetting the illegal export of American-made arms from within the United States, the government's appeal, following the grant of a post-verdict motion for judgment, addressed only the sufficiency of the evidence to convict; the court was not presented with the contention made by Yakou that aiding and abetting liability does not apply to a non-U.S. person located outside the United States. Because the Brokering Amendment and the ITAR limit the extraterritorial liability for failing to register with the State Department and to obtain a license before engaging in brokering activities to "U.S. persons," we hold that Yakou, as a non-U.S. person located outside the United States, cannot aid and abet his son's alleged violation of the Brokering Amendment and the ITAR outside the United States.

Accordingly, we affirm the district court's order dismissing the indictment.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, *concurring in the judgment*:

Although I concur in the judgment, I do so somewhat reluctantly because the government has waived at least two issues that, had they been raised, might have convinced me to reverse. First, to me, the phrase "[a]ny U.S. person, *wherever located*, ...," 22 C.F.R. § 129.3(a) (emphasis added), contemplates that the statute has extraterritorial reach over an LPR, who is included in the term "U.S. person," as well as a U.S. citizen. *See* 22 C.F.R. § 120.15. Because a "U.S. person" includes both citizens and LPRs, both can violate the Brokering Amendment while outside (and, presumably, for longer than "temporarily") the United States, i.e., "wherever located." If the drafters had intended the statute's extraterritorial reach to include only U.S. citizens, the regulation would have provided "any U.S. citizen, wherever located, and any other U.S. person or foreign person located in the United States…." Although we conclude that Yakou had lost his LPR status before he allegedly violated the Brokering Amendment outside the United States, nonetheless an LPR *can* violate the Brokering Amendment outside the United States.

Second, the determination of Yakou's status as a "U.S. person" *vel non* seems to me to be a question of fact for the jury. The majority appears to consider it both a question of law and a sufficiency of the evidence issue. *See* Maj. Op. at 11 ("the existence of undisputed facts obviated the need for the district court to make factual determinations properly reserved for a jury"); *id*. ("we … uphold[] the district court's pretrial dismissal of the indictment based on a question of law…."). The government, however, has chosen not to press either issue and, accordingly, I agree with the majority that the district court must be affirmed.

One further cautionary note: In upholding the district court's dismissal of the aiding and abetting count, the majority

declares that "Congress … did not go to such lengths to exclude non-U.S. persons from direct extraterritorial liability under the Brokering Amendment only to permit these same persons to be charged under an aiding-and-abetting statute for the identical conduct…." Maj. Op. at 23. The district court concluded that "'facilitating' a brokering act is equivalent to 'aiding and abetting' such an act" and therefore, without jurisdiction over Yakou as a principal, the aiding and abetting count against him could not stand. Dist. Ct. Mem. Op. at 17 (April 9, 2004) [YA 30]. In other statutory contexts, however — and in the absence of the jurisdictional defect that is dispositive here — the inclusion of "facilitating" as an illegal act has not prevented the government from successfully charging a defendant with aiding and abetting a facilitation. For example, paragraph two of 18 U.S.C. § 545 makes it a crime for any person to knowingly "facilitate[] the transportation, concealment, or sale" of smuggled goods after importation. *Id*. In *United States v. Dodd*, 43 F.3d 759 (1st Cir. 1995), the First Circuit upheld Dodd's aiding and abetting conviction based on his having *facilitated* the transportation of smuggled weapons. *Id*. at 762–3. Thus, the majority's declaration should not, I believe, be read to mean that an aiding and abetting conviction can never be secured under the Brokering Amendment of the Arms Export Control Act (AECA).